UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BARRETTE OUTDOOR LIVING, INC.,
also d/b/a U.S. FENCE INC.,

       Plaintiff,

v.

MICHIGAN RESIN REPRESENTATIVES, LLC,
a Michigan limited liability company; JOHN H.
LEMANSKI, JR., an individual; LISA J. WELLS a/k/a
LISA J. LEMANSKI, an individual; and TAMARA
L. TURNER, an individual,

       Defendants.

_____/

Case No. _____

Hon. _____

Scott R. Knapp (P61041)
Michael J. Pattwell (P72419)
Ryan M. Shannon (P74535)
DICKINSON WRIGHT PLLC
Attorneys for Plaintiff
215 S. Washington Square, Suite 200
Lansing, MI 48933-1812
(517) 371-1730

_____/

## COMPLAINT

Plaintiff Barrette Outdoor Living, Inc., also d/b/a U.S. Fence, Inc. ("Barrette"), for its

Complaint against Defendants Michigan Resin Representatives, LLC ("MRR"); John H.

Lemanski, Jr. ("Lemanski"); Lisa J. Wells a/k/a Lisa J. Lemanski ("Wells"); and Tamara L.

Turner ("Turner") (collectively, "Defendants") states:

## PARTIES

1.     Plaintiff Barrette is an Ohio corporation with its principal place of business

located at 7830 Freeway Circle, Middleburg Heights, Ohio 44130.  Barrette is authorized to do

business in Michigan, and engaged in the production and distribution of, *inter alia*, vinyl lattice,

lawn and garden utility screens, and vinyl shed components at, among other locations, 3200 Robert Longway Boulevard, Flint, Michigan 48506 ("Flint Facility").

2.      Defendant Lemanski is an individual residing at 1131 Cove Road, Wales, Michigan, 48027, and is a former Senior Buyer at Barrette's Flint Facility.  Lemanski is also the brother of Wells and, upon information and belief, a silent member and owner of MRR.

3.      Defendant MRR is a Michigan limited liability company with its principal place of business at 8312 Honeytree Boulevard, Canton, Michigan 48187.  MRR is, upon information and belief, owned and operated by Turner, Wells, and Lemanski.

4.      Defendant Wells is an individual residing at 8312 Honeytree Boulevard, Canton, Michigan 48187, and is a member of MRR.  Wells is also the sister of Lemanski, and the long-time friend and roommate of Turner.

5.      Defendant Turner is an individual residing at 8312 Honeytree Boulevard, Canton, Michigan 48187, and is a member of MRR.  Turner is also the long-time friend and roommate of Wells.

## RELEVANT NON-PARTIES

6.      Resin Distribution Inc. ("RDI") is a distributor of, among other products, high density polyethylene resin ("Resin"), a plastic substance transported in the form of solid pellets.  RDI's principal place of business is located at 1 Sculley Road, Molumco Industrial Park, Ayer, Massachusetts, 01432.  RDI operates Resin warehouses across the United States and Canada.

7.      Mario Gaudreault is an individual residing at 296 Monique-Corriveau Street, Saint-Nicolas, Québec, Canada (G7A 4Z5), the former General Manager of Barrette's Flint Facility, and the former direct supervisor of Lemanski.

2

## JURISDICTION and VENUE

8.      This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332.  Plaintiff Barrette is an Ohio corporation with its principal place of business in Ohio.  Defendant MRR is a Michigan limited liability company with its principal place of business in Wayne County, Michigan.  Defendant Lemanski is a Michigan resident living in St. Clair County, Michigan.  Defendant Turner is a Michigan resident living in Wayne County, Michigan.  Defendant Wells is a Michigan resident living in Wayne County, Michigan.  There is thus complete diversity between Plaintiff and Defendants.  The amount in controversy, without interest and costs, exceeds $75,000.00.

9.      This Court also has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. §§ 1331 and 1367 where Counts VIII and IX arise under the laws of the United States and where Counts I-VII and X-XI  are so related to Counts VIII and IX that they form part of the same case or controversy.

10.      Venue in this Court is proper under 28 U.S.C. § 1391(a) and 18 U.S.C. § 1965(a), where (a) Defendants Lemanski, MRR, Turner, and Wells reside in the Eastern District of Michigan and are subject to personal jurisdiction there; and (b) a substantial part of the events and transactions giving rise to the claims alleged herein occurred in the Eastern District of Michigan.

## GENERAL ALLEGATIONS

### A.      Nature Of Barrette's Business And Resin Purchases

11.      Barrette is one of the United States' largest manufacturers and distributors of wood and vinyl fencing -- among other outdoor products.  Specifically, Barrette's Flint Facility is dedicated to manufacturing vinyl lattice, lawn and garden utility screens, and vinyl shed

components.  The primary material used in the manufacturing of those vinyl products is Resin.

Barrette purchases approximately twenty-five (25) million pounds of Resin annually.

12.     Resin is sold on a per pound basis and usually transported via truck or train in

1,000 pound boxes or 200,000 pound railcars.  The market price of Resin changes due to market

forces, and is determined by soliciting bids from producers and distributors.  Barrette usually

purchases Resin from Resin *producers* such as M. Holland Company; H. Muehlstein &

Company; Osterman and Company; and Chevron Phillips Chemical Company.

13.     Barrette has, however, historically purchased Resin from RDI, a *distributor* of

Resin.  Relevantly, Barrette began purchasing Resin from RDI in 2005.

**B.     Lemanski's Duties As A Senior Buyer At Barrette**

14.     On October 29, 2007, Barrette hired Lemanski as a Senior Buyer at its Flint

Facility.   As a Senior Buyer, Lemanski was responsible for all of Barrette's purchasing

operations, including Barrette's purchase of Resin at no more than fair-market prices.  Indeed,

one of Lemanski's most important functions was to ensure that Barrette paid the lowest amount

possible for Resin.

15.     Lemanski had a duty to ensure that the prices paid by Barrette for Resin were fair-

market prices.

16.     To purchase Resin, Lemanski would generally take the following actions:

(a)     Ascertain Barrette's Resin requirements;

(b)     Determine the market price of Resin by contacting producers and
        distributors;

(c)     Negotiate the terms of purchase for the required amount of Resin;

(d)     Create a proposed purchase order stating the terms of the recommended
        Resin purchases;

4

> (e)   Compile purchase-order and market-pricing data into a weekly Excel spreadsheet for approval by the General Manager of Barrette's Flint Facility;
>
> (f)   Submit a request to the General Manager of Barrette's Flint Facility for approval of the proposed purchase order via e-mail, orally, and/or through Barrette's SAP accounting system;
>
> (g)   Transmit the approved purchase order to the producer or distributor supplying the Resin; and
>
> (h)   Track the ordered shipment of Resin to ensure on-time delivery and confirm receipt of same.

17.   Specifically, Lemanski was required to obtain the approval of the General Manager of the Flint Facility before placing a purchase order for Resin.  In order to obtain such approval, Lemanski was required to inform the General Manager of the quantity and price of the Resin being ordered and from whom the Resin was being purchased.

18.   By submitting to the General Manager the price of the Resin being ordered, Lemanski represented to the General Manager and Barrette that the prices of the ordered Resin were fair-market prices.

19.   On many occasions, Lemanski would demonstrate the fair-market price of the Resin being ordered by providing Barrette's General Manager with a spreadsheet showing the prices Barrette paid to various suppliers for Resin during the past week(s) (the "Price Spreadsheets").

20.   In approving the Resin purchase orders submitted by Lemanski, the General Manager and Barrette relied upon Lemanski's representations that the prices of the Resin being purchased were fair-market prices, and not inflated or above-market prices.

**C.   Formation Of MRR And The Nature Of MRR's Putative Business**

21.   On February 4, 2010, Wells and Turner formed MRR by filing with the State of Michigan MRR's Articles of Organization and paying the appropriate fee.  Upon information

5

and belief, MRR was capitalized with only the funds necessary to pay the State of Michigan the appropriate formation fee.

22.     At the time MRR was formed, Turner and Wells neither possessed any knowledge of the Resin industry, nor had any like sales, purchasing, or buying experience.

23.     The sole commercial purpose of MRR was to (a) enter into contracts with RDI for the purchase of Resin at fair-market prices; and (b) resell same to Barrette at inflated and above-market prices.

24.     During the entire course of MRR's existence, the only supplier of Resin with which MRR contracted was RDI; and the only purchaser of Resin with which MRR ever contracted was Barrette.

**D.     Defendants' Fraudulent Purchasing Scheme**

25.     In February of 2010, Lemanski began using his position and status as a Senior Buyer at Barrette to divert Barrette's purchases of Resin away from RDI and other suppliers to MRR at inflated and above-market prices.

26.     In February 2010, Lemanski contacted Brett Masotta (RDI's National Sales Manager) by interstate wire and advised Masotta/RDI that Barrette would no longer purchase Resin directly from RDI.   In lieu thereof, Lemanski requested that Masotta/RDI sell Resin directly to MRR.   Masotta/RDI agreed to Lemanski's request.

27.     On or about February 11, 2010, Lemanski began using his position as Barrette's Senior Buyer to coordinate (via interstate wire) fair-market Resin transactions between RDI and MRR.

28.     From February 11, 2010, through April 20, 2011, MRR (at Lemanski's direction) used interstate wires to purchase from RDI 5,769,662 pounds of Resin for $3,817,746.79.  The details of each of the 14 transactions are as follows:

(a)     On February 11, 2010, MRR used interstate wires to purchase from RDI 50,380 pounds of Resin at an average price of $0.63 per pound, and at a total price of $31,739.40;

(b)     On March 5, 2010, MRR used interstate wires to purchase from RDI 7,000 pounds of Resin at an average price of $0.62 per pound, and at a total price of $4,340.00;

(c)     On March 17, 2010, MRR used interstate wires to purchase from RDI 197,750 pounds of Resin at an average price of $0.76 per pound, and at a total price of $150,290.00;

(d)     On March 22, 2010, MRR used interstate wires to purchase from RDI 169,332 pounds of Resin at an average price of $0.69 per pound, and at a total price of $116,839.08;

(e)     On May 4, 2010, MRR used interstate wires to purchase from RDI 42,000 pounds of Resin at an average price of $0.68 per pound, and at a total price of $28,560.00;

(f)     On July 21, 2010, MRR used interstate wires to purchase from RDI 773,899 pounds of Resin at an average price of $0.55 per pound, and at a total price of $424,682.20;

(g)     On October 21, 2010, MRR used interstate wires to purchase from RDI 191,350 pounds of Resin at an average price of $0.64 per pound, and at a total price of $122,464.00;

(h)     On December 7, 2010, MRR used interstate wires to purchase from RDI 192,950 pounds of Resin at an average price of $0.68 per pound, and at a total price of $131,206.00;

(i)     On December 14, 2010, MRR used interstate wires to purchase from RDI 80,556 pounds of Resin at an average price of $0.67 per pound, and at a total price of $54,173.91;

(j)     On January 5, 2011, MRR used interstate wires to purchase from RDI 2,340,396 pounds of Resin at an average price of $0.66 per pound, and at a total price of $1,551,247.13;

    (k)    On January 5, 2011, MRR used interstate wires to purchase from RDI 578,749 pounds of Resin at an average price of $0.65 per pound, and at a total price of $374,943.82;

    (l)    On February 14, 2011, MRR used interstate wires to purchase from RDI 182,700 pounds of Resin at an average price of $0.67 per pound, and at a total price of $121,495.50;

    (m)    On April 20, 2011, MRR used interstate wires to purchase from RDI 589,450 pounds of Resin at an average price of $0.74 per pound, and at a total price of $434,321.50; and

    (n)    On April 20, 2011, MRR used interstate wires to purchase from RDI 373,150 pounds of Resin at an average price of $0.73 per pound, and at a total price of $271,444.25.

29.    On or about February 11, 2010, Lemanski also began using his position as Barrette's Senior Buyer to cause Barrette to purchase from MRR the same Resin MRR purchased from RDI.

30.    At no time did Lemanski inform any Barrette representative that he had an interest in MRR, or that MRR was, in part, controlled by his sister, Wells.

31.    From February 11, 2010, through April 20, 2011, Barrette (at Lemanski's direction) purchased from MRR 5,781,562 pounds of Resin for $4,234,572.89. The details of each of the 14 transactions are as follows:

    (a)    On February 11, 2010, Barrette purchased from MRR 50,380 pounds of Resin at an average price of $0.65 per pound, and at a total price of $32,747.00;

    (b)    On March 5, 2010, Barrette purchased from MRR 7,000 pounds of Resin at an average price of $0.665 per pound, and at a total price of $4,655.00;

    (c)    On March 17, 2010, Barrette purchased from MRR 197,750 pounds of Resin at an average price of $0.76 per pound, and at a total price of $150,290.00;

    (d)    On March 22, 2010, Barrette purchased from MRR 169,332 pounds of Resin at an average price of $0.715 per pound, and at a total price of $121,072.38;

8

(e)    On May 4, 2010, Barrette purchased from MRR 42,000 pounds of Resin at an average price of $0.73 per pound, and at a total price of $30,660.00;

(f)    On July 21, 2010, Barrette purchased from MRR 773,900 pounds of Resin at an average price of $0.58 per pound, and at a total price of $448,862.00;

(g)    On October 21, 2010, Barrette purchased from MRR 191,350 pounds of Resin at an average price of $0.685 per pound, and at a total price of $131,074.75;

(h)    On December 7, 2010, Barrette purchased from MRR 192,950 pounds of Resin at an average price of $0.715 per pound, and at a total price of $137,959.25;

(i)    On December 14, 2010, Barrette purchased from MRR 80,414 pounds of Resin at an average price of $0.715 per pound, and at a total price of $58,926.01;

(j)    On January 5, 2011, Barrette purchased from MRR 2,340,400 pounds of Resin at an average price of $0.767 per pound, and at a total price of $1,794,092.50;

(k)    On January 5, 2011, Barrette purchased from MRR 588,749 pounds of Resin at an average price of $0.756 per pound, and at a total price of $445,361.50;

(l)    On February 14, 2011, Barrette purchased from MRR 182,700 pounds of Resin at an average price of $0.62 per pound, and at a total price of $113,274.00;

(m)    On April 20, 2011, Barrette purchased from MRR 589,450 pounds of Resin at an average price of $0.802 per pound, and at a total price of $472,675.75; and

(n)    On April 20, 2011, Barrette purchased from MRR 373,150 pounds of Resin at an average price of $0.785 per pound, and at a total price of $292,922.75.

32.    Twelve (12) of the fourteen (14) MRR/Barrette transactions were at prices significantly more than the sums MRR paid to RDI for the same Resin.

33.    The difference between the total price of the Resin RDI sold to MRR and the total price of the same Resin MRR resold to Barrette was $416,826.10. That is, MRR inflated the price of the Resin it resold to Barrette by $416,826.10.

9

34.     The Resin MRR purchased from RDI was shipped directly to Barrette by RDI, and at no point did MRR ever take possession of same.

35.     The purchase contracts between MRR and Barrette contained payment terms of 20 days.  The purchase contracts between MRR and RDI contained payment terms of 30 days. Therefore, because Barrette's payment terms with MRR were substantially shorter than MRR's payment terms with RDI, MRR first collected payment from Barrette before paying RDI.  At no point did MRR ever pay RDI before receiving the corresponding payment from Barrette.

36.     The only Barrette representative with whom MRR contracted for the sale of Resin was Lemanski.

37.     To obtain approval for the MRR/Barrette transactions detailed in paragraph 31(a)-(n), Lemanski falsely represented to Mario Gaudreault, Todd Dixon, and/or other Barrette personnel that the prices Lemanski selected for the MRR transactions were fair-market prices.

38.     From February 2010 through April 2011, Lemanski transmitted to Mario Gaudreault, Todd Dixon, and/or other Barrette personnel the 14 MRR/Barrette purchase orders, and thereby represented that the prices set forth therein were fair-market prices.

39.     Lemanski did not disclose to any Barrette representative that the prices set forth in the Barrette/MMR purchase orders, and actually paid to MRR by Barrette, were inflated and above-market prices.

40.     Lemanski did not disclose to any Barrette representative that the prices set forth in the Barrette/MMR purchase orders, and actually paid to MRR by Barrette, were significantly more than the prices MRR paid to RDI for the same Resin.

41.     Lemanski orally misrepresented to Mario Gaudreault, Todd Dixon, and other Barrette personnel, that the prices contained in MRR/Barrette purchase orders were fair-market prices.

42.     From February 2010 through April 2011, Lemanski (a) altered the Pricing Spreadsheets so that the Resin prices stated therein would be inflated and congruent with the price contained in the MRR/Barrette purchase orders; and (b) then presented the altered Pricing Spreadsheets to Mario Gaudreault, Todd Dixon, and/or other Barrette personnel, for the purpose of convincing same that the MRR/Barrette purchase orders contained fair-market prices.

43.     From February 2010 through June 2011, Lemanski entered into and removed from Barrette's SAP accounting system false and inflated purchases orders for Resin suppliers other than MRR for the purpose of concealing from Barrette the inflated prices charged by and paid to MRR.

## COUNT I
## FRAUDULENT MISREPRESENTATION
### (Lemanski)

44.     Barrette incorporates the foregoing allegations as though fully restated here.

45.     From February 2010 to April 2011, Lemanski represented to Mario Gaudreault, Todd Dixon, and/or other Barrette personnel that the prices Lemanski selected for the MRR/Barrette transactions were fair-market prices.

46.     At the time those representations were made, the representations were both material and false, as the price contained in MRR/Barrette purchase orders were inflated and above-market price.

47.     At the time the false representations were made, Lemanski knew that the prices contained in the MRR/Barrette purchase orders were inflated and above-market prices.

48.     Lemanski made the false representations with the intention to induce Barrette's detrimental reliance, and to benefit himself, MRR, Wells, and Turner.

49.     Barrette relied upon Lemanski's false representations, by approving the MRR/Barrette purchase orders and actually paying MRR inflated and above-market prices for the same Resin MRR purchased at market prices from RDI.

50.     As a result of its reliance upon Lemanski's false representations, Barrette suffered substantial monetary injury.

WHEREFORE, Plaintiff Barrette prays for a judgment against Defendant Lemanski, as to Count I of the Complaint, awarding Plaintiff money damages, interest, costs, attorney fees, and such other and further relief that this Honorable Court finds just and equitable.

### COUNT II
### SILENT FRAUD
### (Lemanski)

51.     Barrette incorporates the foregoing allegations as though fully restated here.

52.     Lemanski knew Barrette believed that the prices Lemanski designated in the MRR/Barrette purchase orders were fair-market prices.

53.     Lemanski had a legal duty to notify Barrette that the prices Lemanski placed in the MRR/Barrette purchase orders were inflated and above-market prices.

54.     Lemanski did not disclose the fact that the prices he inserted into the MRR/Barrette purchase orders were inflated and above-market prices.

55.     Lemanski knew that nondisclosure of the true status of those prices would mislead Barrette.

56.     Barrette acted in reliance on this silent fraud by approving the MRR/Barrette purchase orders and actually paying to MRR inflated and above-market prices for the same Resin MRR purchased at a lower price from RDI.

57.     As a result of its reliance upon Lemanski's silent fraud, Barrette suffered substantial monetary injury.

WHEREFORE, Plaintiff Barrette prays for a judgment against Defendant Lemanski, as to Count II of the Complaint, awarding Plaintiff money damages, interest, costs, attorney fees, and such other and further relief that this Honorable Court finds just and equitable.

## COUNT III
## FRAUDULENT INDUCEMENT
### (Lemanski)

58.     Barrette incorporates the foregoing allegations as though fully restated here.

59.     Lemanski affirmatively and repeatedly represented to Barrette that the prices Lemanski put into the MRR/Barrette purchase orders were fair-market prices.

60.     Those representations were material and false when made, as the prices contained in those purchase orders were inflated and above-market prices.

61.     Lemanski intended that Barrette rely on his false representations.

62.     Barrette did rely on Lemanski's false representations by approving the MRR/Barrette purchase orders, and by paying the invoices sent to Barrette by MRR.

63.     As a result of Lemanski's dishonesty and misrepresentations, Barrette suffered substantial economic losses, including, but not limited to the difference between the inflated prices Barrette paid to MRR and the fair-market prices MRR paid to RDI.

13

WHEREFORE, Plaintiff Barrette prays for a judgment against Defendant Lemanski, as to Count III of the Complaint, awarding Plaintiff money damages, interest, costs, attorney fees, and such other and further relief that this Honorable Court finds just and equitable.

## COUNT IV
## BREACH OF FIDUCIARY DUTY
### (Lemanski)

64.     Barrette incorporates the foregoing allegations as though fully restated here.

65.     While employed by Barrette as a Senior Buyer, Lemanski was placed in a position of trust and confidence which gave rise to the fiduciary duties of loyalty, honesty, good faith and fair dealing.

66.     As a Senior Buyer, Lemanski had the authority to bind Barrette to Resin contracts, and therefore served as Barrette's agent.

67.     Lemanski's fiduciary duties precluded him from competing against Barrette, self dealing, and diverting business opportunities away from Barrette for his own personal gain.

68.     Lemanski breached the fiduciary duties he owed to Barrette by repeatedly, knowingly, and wrongfully (a) causing Barrette *not* to purchase Resin directly from RDI at fair-market prices; and (b) causing Barrette to purchase Resin from MRR at inflated and above-market prices.

69.     Lemanski's conduct was in his own self interest and in conflict with the interests of Barrette.

70.     As a direct and proximate result of those numerous breaches, Barrette has suffered substantial monetary damages that were reasonably foreseeable by Lemanski.

WHEREFORE, Plaintiff Barrette prays for a judgment against Defendant Lemanski, as to Count IV of the Complaint, awarding Plaintiff money damages, interest, costs, attorney fees, and such other and further relief that this Honorable Court finds just and equitable.

## COUNT VI
## INDUCEMENT OF BREACH OF FIDUCIARY DUTY
### (MRR, Wells, and Turner)

71.     Barrette incorporates the foregoing allegations as though fully restated here.

72.     As set forth above, Lemanski breached his fiduciary duties to Barrette.

73.     MRR, Wells, and Turner knowingly and intentionally induced Lemanski to breach his fiduciary duties to Barrette, by encouraging Lemanski to (a) divert to MRR Barrette's opportunity to purchase at fair-market prices Resin directly from RDI; and (b) cause Barrette to purchase Resin from MRR at inflated and above-market prices.

74.     As a direct and proximate result of MRR's, Turner's, and Wells' inducements, Barrette has suffered damages that were reasonably foreseeable by MRR, Wells, and Turner.

WHEREFORE, Plaintiff Barrette prays for a judgment against Defendants MRR, Wells, and Turner, as to Count V of the Complaint, awarding Plaintiff money damages, interest, costs, attorney fees, and such other and further relief that this Honorable Court finds just and equitable.

## COUNT VI
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (MRR, Wells, and Turner)

75.     Barrette incorporates the foregoing allegations as though fully restated here.

76.     As set forth above, Lemanski breached his fiduciary duties to Barrette.

77.     MRR, Wells, and Turner substantially and intentionally aided and abetted Lemanski in breaching those fiduciary duties by (a) usurping Barrette's opportunity to purchase Resin at fair-market prices directly from RDI; (b) submitting to Barrette inflated and above-

market prices for Resin; and (c) accepting inflated and above-market payment from Barrette for the Resin MRR had purchased from RDI at fair market prices.

78.     At the time MRR, Wells, and Turner took those actions, they knew that Lemanski did not have the right to (a) divert to MRR Barrette's opportunity to purchase Resin at fair-market prices directly from RDI; or (b) cause Barrette to purchase Resin from MRR at inflated and above-market prices.

79.     As a direct and proximate result of MRR's, Turner's, and Wells' actions, Barrette has suffered damages that were reasonably foreseeable by MRR, Wells, and Turner.

WHEREFORE, Plaintiff Barrette prays for a judgment against Defendants MRR, Wells, and Turner, as to Count VI of the Complaint, awarding Plaintiff money damages, interest, costs, attorney fees, and such other and further relief that this Honorable Court finds just and equitable.

**COUNT VII**
**TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIP**
**(All Defendants)**

80.     Barrette incorporates the foregoing allegations as though fully restated here.

81.     At all times relevant, Barrette had an existing business relationship and reasonable expectancy of continued business relationship with RDI whereby RDI would sell to Barrette Resin at fair-market prices.

82.     At all times pertinent, Defendants had knowledge of Barrette's business relationship and expectancy with RDI.

83.     From February 2010 to April 2011, Defendants intentionally and improperly interfered with Barrette's business relationship and expectancy with RDI.

84.     Among other wrongful acts committed between February 2010 to June 2011, Lemanski (a) used his position and title as a Senior Buyer at Barrette to direct RDI employees to sell to MRR Resin which would have otherwise been sold directly to Barrette; (b) purchased for

16

Barrette that same Resin from MRR at inflated and above-market prices; and (c) concealed same from Barrette by means for fraud and misrepresentation.

85.     Lemanski's intentional diversion to MRR of Barrette's business opportunity and expectancy with RDI was per se wrongful, committed with malice, and without justification.

86.     Moreover, Lemanski's intentional and wrongful actions were motivated by his personal interests and were taken solely for his own benefit.

87.     Lemanski's intentional and wrongful actions did not benefit Barrette.

88.     Among other wrongful acts occurring between February 2010 and June 2011, MRR, Turner, and Wells (a) purchased from RDI Resin which RDI would have otherwise sold to Barrette at fair-market prices; (b) resold the Resin purchased from RDI to Barrette at inflated and above-market prices; and (c) concealed same from Barrette by means for fraud and misrepresentation.

89.     MRR's, Turner's, and Wells' intentional diversion to MRR of Barrette's business opportunity and expectancy with RDI was *per se* wrongful, committed with malice, and without justification.

90.     Defendants' intentional and improper actions caused a disruption of the business relationship between Barrette and RDI from February 2010 until June 2011, and resulted in Barrette purchasing Resin from MRR at inflated prices during that same timeframe.

91.     As a consequence of Defendants' intentional and improper actions, and the resultant disruption of the business relationship between Barrette and RDI, Barrette suffered substantial monetary injury.

WHEREFORE, Plaintiff Barrette prays for a judgment against all Defendants, jointly and severally, as to Count VII of the Complaint, awarding Plaintiff money damages, interest, costs, attorney fees, and such other and further relief that this Honorable Court finds just and equitable.

## COUNT VIII
## VIOLATION OF SECTION 1962(c) OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")
## (All Defendants)

92.     Barrette incorporates the foregoing allegations as though fully restated here.

93.     18 U.S.C. § 1962(c) states that:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

94.     Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

95.     From February 2010 to the present, Defendants collaborated as an ongoing organization and functioned as a continuing unit (*i.e.*, an "Enterprise," as defined under 18 U.S.C. § 1961(4)), for the purpose of perpetrating and concealing the fraudulent purchasing scheme described in paragraphs 25 through 43 of this Complaint (the "Fraudulent Purchasing Scheme").

96.     Defendants are employed by and/or associated with the Enterprise and conduct and participate in the operation and management of the Enterprise.

97.     In the course of carrying out the Fraudulent Purchasing Scheme against Barrette, the Enterprise engaged in and conducted activities which affected foreign and interstate commerce.  Specifically, MRR sold to Barrette Resin which was shipped across Michigan state lines to Barrette's Flint Facility.

98.     Between February 2010 and June 2011, Defendants conducted and participated in at least two predicate acts of "racketeering activity," as defined in 18 U.S.C. § 1961(1).

99.     Those predicate acts of "racketeering activity," came in the form of wire fraud, as defined in 18 U.S.C. § 1343.

100.    On numerous occasions between February 2010 and June 2011, Defendants (a) voluntarily and intentionally participated in the Fraudulent Purchasing Scheme for the purpose of defrauding Barrette out of money, and (b) used interstate wires to transmit to RDI and Barrette employees telephone calls and email transmissions which contained false representations or misleading omissions that furthered the Fraudulent Purchasing Scheme.

101.    Those predicate acts of wire fraud occurred within ten (10) years of one another and constitute a pattern of racketeering activity under 18 U.S.C. § 1961(5).

102.    As a direct and proximate result of Defendants' commission of those predicate acts and participation in that pattern of racketeering activity, Barrette has suffered substantial monetary damages in excess of $400,000.00.

103.    By reason of Defendants' violations of 18 U.S.C. § 1962(c), Barrette is entitled to threefold damages it sustained plus reasonable attorneys fees and costs pursuant to 18 U.S.C. § 1964(c).

WHEREFORE, Plaintiff Barrette prays for a judgment against all Defendants, jointly and severally, as to Count VIII of the Complaint, awarding Plaintiff threefold money damages, interest, costs, attorney fees, and such other and further relief that this Honorable Court finds just and equitable.

## COUNT IX
## VIOLATION OF SECTION 1962(d) OF RICO
### (All Defendants)

104.     Barrette incorporates the foregoing allegations as though fully restated here.

105.     Defendants collectively agreed to perpetrate the Fraudulent Purchasing Scheme against Barrette and otherwise conspired for the purpose of perpetrating Fraudulent Purchasing Scheme against Barrette.

106.     Defendants' Fraudulent Purchasing Scheme to defraud Barrette objectively manifested a knowing and voluntary agreement by Defendants to participate in a racketeering enterprise through the commission of two or more predicate acts of racketeering activity in violation of 18 U.S.C. § 1962(d).

107.     As a direct and proximate result of Defendants' commission of those predicate acts and participation in that pattern of racketeering activity, Barrette has suffered substantial monetary damages in excess of $400,000.00.

108.     By reason of Defendants' violations of 18 U.S.C. § 1962(d), Barrette is entitled to the threefold damages it sustained plus reasonable attorneys fees and costs pursuant to 18 U.S.C. § 1964(c).

WHEREFORE, Plaintiff Barrette prays for a judgment against all Defendants, jointly and severally, as to Count IX of the Complaint, awarding Plaintiff threefold money damages, interest, costs, attorney fees, and such other and further relief that this Honorable Court finds just and equitable.

## COUNT X
## CONSPIRACY
### (All Defendants)

109.     Barrette incorporates the foregoing allegations as though fully restated here.

20

110.    Defendants illegally, maliciously, and wrongfully conspired with one another for the illegal purpose of (a) diverting and usurping Barrette's opportunity to purchase Resin at fair-market prices from RDI; (b) making fraudulent and silent misrepresentations to Barrette; and (c) breaching the fiduciary duties Lemanski owed to Barrette.

111.    Defendants, in combination, conspired to personally benefit from such diversion, usurpation, and wrongful conduct at the expense of Barrette.

112.    This conspiracy resulted in the unlawful and tortious activity of (a) fraudulent and silent misrepresentations; (b) fraudulent inducement; (c) breaches of fiduciary duties; and (d) tortious interference with an advantageous business relationship.

113.    As a result of this conspiracy, and Defendants' actual wrongful and unlawful tortious acts, Barrette sustained significant damages.

114.    Defendants are jointly and severally liable to Barrette for all of Barrette's injuries and damages.

WHEREFORE, Plaintiff Barrette, prays for a judgment against Defendants, jointly and severally, as to Count X of the Complaint, awarding Plaintiff money damages, interest, costs, attorney fees, and such other and further relief that this Honorable Court finds just and equitable.

## COUNT XI
## PIERCING THE CORPORATE VEIL
### (Turner and Wells)

115.    Barrette incorporates the foregoing allegations as though fully restated here.

116.    Defendants Turner and Wells are/were the sole members of MRR.

117.    MRR was formed and used to commit a fraud or a wrong where MRR (a) usurped Barrette's opportunity to purchase Resin at fair-market prices directly from RDI; (b) sold to Barrette at inflated and above-market prices, the same Resin MRR purchased from RDI; (c)

21

received from Barrette payment for same; (d) violated 18 U.S.C. 1962(c) and (d); (e) conspired with other Defendants to make fraudulent and silent misrepresentations to Barrette; and (f) aided and abetted Lemanski's breaches of fiduciary duties.

118.    As a result of MRR's unlawful conduct, Barrette suffered an unjust loss, as set forth above.

119.    At all times relevant, MRR had no employees (other than Turner and Wells).

120.    MRR was at all times undercapitalized, and is now insolvent.

121.    Upon information and belief, Turner and Wells used MRR funds to purchase personal items and pay personal debt.

122.    MRR did not adhere to corporate formalities, was formed solely to defraud Barrette and benefit Defendants, and is thus a mere instrumentality of Turner and Wells.

123.    It would here be inequitable to recognize the fiction of a distinct corporate entity.

124.    Piercing the corporate veil is appropriate when there is evidence of fraud, illegality, or injustice.

125.    Based upon the facts set forth in this Complaint, this Court should pierce MRR's corporate veil, and enter judgment against its members, Turner and Wells, jointly and severally, for any judgment amounts entered against MRR.

WHEREFORE, Plaintiff Barrette respectfully requests that this Honorable Court enter judgment against Turner and Wells, jointly and severally, and award damages in the full amount of any judgment against MRR, plus interest, costs, attorneys fees, and such other and further relief as this Court deems just and equitable.

Respectfully submitted,

DICKINSON WRIGHT PLLC
Attorneys for Plaintiff

By:  s/Michael J. Pattwell
       Scott R. Knapp (P61041)
       Michael J. Pattwell (P72419)
       Ryan M. Shannon (P74535)
Business Address:
       215 S. Washington Square, Suite 200
       Lansing, MI  48933-1816
Telephone: (517) 371-1730
E-mail: sknapp@dickinsonwright.com
       mpattwell@dickinsonwright.com
       rshannon@dickinsonwright.com

Dated:  July 29, 2011

LANSING 50522-1 456243v2