UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


BARRETTE OUTDOOR LIVING, INC. d/b/a
U.S. FENCE INC.,

        Plaintiff/Counter-Defendant,          Civil Action No. 2:11-cv-13335

        v.                               District Judge Julian Abele Cook
                                     Magistrate Judge Laurie J. Michelson


MICHIGAN RESIN REPRESENTATIVES,
LLC, a Michigan limited liability company;
LISA J. WELLS a/k/a LISA J. LEMANSKI,
an individual; and TAMARA L. TURNER,
an individual,

        Defendants,

        and

JOHN H. LEMANSKI, JR., an individual,

        Defendant/Counter-Plaintiff.

_____/

**REPORT AND RECOMMENDATION TO GRANT IN PART
PLAINTIFF BARRETTE OUTDOOR LIVING INC.'S MOTION FOR SPOLIATION
SANCTIONS AGAINST DEFENDANT JOHN LEMANSKI [91]**

      Barrette Outdoor Living, Inc. manufactures wood and vinyl siding.  (Compl. ¶ 11.)  To do

so, it purchases millions of pounds of resin each year.  (*Id.*)  Barrette says that while Lemanski

worked for the company, one of his "most important" tasks was to "ensure that Barrette paid the

lowest amount possible for [r]esin."  (Compl. ¶ 14.)  Barrette claims that, beginning in February

2010, Lemanski did anything but that.  (Compl. ¶ 25.)  More specifically, Barrette says that

Lemanski directed Michigan Resin Representatives, LLC ("MRR"), a company allegedly run by

Lemanski's half-sister, Lisa Wells, and her roommate, Tamara Turner, to purchase millions of

pounds of resin for about $3.8 million.  (Compl. ¶¶ 26-28.)  Then, allegedly at Lemanski's direction, Barrette purchased a virtually identical amount of resin from MRR for over $4.2 million—over $400,000 more than what MRR had paid.  (Compl. ¶¶ 31-33.)  Barrette believes that Lemanski, Wells, Turner, or some combination of those individuals, pocketed the difference.

Barrette contends that Lemanski has intentionally destroyed evidence of this scheme, thereby severely prejudicing Barrette's ability to prove its case.  In particular, Barrette claims that, despite having a duty to preserve evidence, Lemanski deleted files from his work computer, discarded his cell phone, and used scrubbing software to permanently delete 270,000 files from his personal laptop.  Barrette has thus moved for spoliation sanctions, including default judgment against Lemanski.  (Dkt. 91, Barrette's Mot. for Sanctions.)  Barrette's motion has been referred to this Court.  (Dkt. 94.)  After studying the briefs (Dkts. 91, 93, 98, 103, 115, 117), hearing oral argument, and holding a multi-day evidentiary hearing, the Court finds that Lemanski improperly discarded his cell phone and wiped his personal laptop.

For this reason and those follow, this Court RECOMMENDS that Barrette's spoliation motion be GRANTED IN PART.  In particular, this Court RECOMMENDS that Lemanski be sanctioned as follows: (1) Lemanski shall pay Barrette $25,000.00 to compensate Barrette for some of the fees and costs Barrette incurred in bringing its spoliation motion; (2) Lemanski shall pay Barrette $10,000.00 for Barrette's increased expenses in conducting discovery and proceeding in this litigation without the spoliated evidence; and (3) at trial, there will be an adverse inference that Lemanski's cell phone and personal laptop contained information unfavorable to Lemanski, including that he was involved with MRR.  The Court further RECOMMENDS that if this Report and Recommendation is adopted, Lemanski must pay Barrette within 60 days of adoption.

2

# I.

## A.

In October 2007, Barrette hired John Lemanski as a "Senior Buyer" for its Flint, Michigan facility.  (Compl. ¶ 14.)  Lemanski was later promoted to "Purchasing Manager."  (Dkt. 91, Barrette's Mot. for Sanctions, Ex. F., McCann Aff. ¶ 5.)

In June 2011, as part of a "facility-wide downsizing," Barrette eliminated the Purchasing Manager position.  (Dkt. 91, Barrette's Mot. for Sanctions, Ex. F, McCann Aff. ¶ 7.)  On June 14, 2011, Barrette informed Lemanski that his employment would end that day.  (McCann Aff. ¶ 8.)

Barrette says that before Lemanski was escorted to collect his belongings, he asked to remove "pirated software" from his work computer.  (McCann Aff. ¶ 12.)  Barrette allowed Lemanski to do so.  (McCann Aff. ¶ 13; *see also* Apr. 1, 2013 Hr'g Tr. at 42, 48-49.)[1]  Christine McCann, the Human Resources Manager at Barrette's Flint facility, says that the following then occurred:

> Once [we were] in Lemanski's office, I witnessed Lemanski logon to his computer and begin deleting, sorting, and moving around all sorts of different documents and files.  I then noticed that Lemanski was emptying the "recycle box" on his computer.  Because it appeared that Lemanski was deleting far more information than "pirated software," I asked him—at least four separate times—to stop deleting documents and logoff of the computer.  He ignored my first three demands.  Finally, after approximately 15 minutes, Lemanski logged off of the machine.

(McCann Aff. ¶ 13.)

---

[1]Throughout this Report and Recommendation, the Court cites to a non-finalized version of the evidentiary hearing transcript that is on file in chambers.  The Court understands that the page numbers will change in the finalized transcription.  If necessary, the Court will provide an updated Report and Recommendation with citation to the final transcript.  Additionally, the exhibits admitted during the evidentiary hearing are on file in chambers.

Lemanski recalls the incident differently. He claims that McCann never asked him to stop deleting files. (Apr. 1, 2013 Hr'g Tr. at 42.) He also says that McCann "made me show her each file I wanted to delete prior to its deletion." (Dkt. 98, Lemanski's Resp. to Mot. for Sanctions, Ex. A, Lemanski Aff. ¶ 12.) And, in his affidavit filed before the evidentiary hearing, Lemanski explained, "Personal files that were deleted from my work computer included bank statements, paycheck stubs and personal email. . . ." (Lemanski Aff. ¶ 12.) At the hearing, however, Lemanski testified slightly differently; he stated that the files he deleted were limited to those relating to the construction of his new home, a video of himself "hula hooping" at a Barrette holiday party, pictures from that party, a speeding ticket, and a software program. (Apr. 1, 2013 Hr'g Tr. at 42-43, 47-48, 81-82.) Regardless of the specifics, Lemanski's fundamental position is that "[n]one of the files [he] copied and/or deleted from my work computer were related to this litigation." (Lemanski Aff. ¶ 13; *see also* Apr. 1, 2013 Hr'g Tr. at 82.)

Barrette recently had Lemanski's work computer analyzed by GW Consulting and Investigators ("Garda"). (*See* Dkt. 91, Barrette's Mot. for Sanctions, Ex. G, Feb. 5, 2013 Garda Rep.; Dkt. 93, Barrette's Supplemental Br. in Supp. of Mot. for Sanctions, Ex. A, Feb. 8, 2013 Garda Rep.) The analysis revealed that during a twelve-hour period on June 14, 2011, 4,481 files were deleted. (Feb. 8, 2013 Garda Rep. at 7.) Among these files, Garda identified 36 as "coming from the usual Office software" (e.g., PDF, Word, or Excel). (*Id.*) Garda further found that these 36 files were deleted by "human intervention" whereas "some" of the 4,481 deleted files were "deleted automatically by the [operating] system, as part of normal operations." (*Id.*) One of Garda's reports suggests that the 36 office files might be recoverable (Feb. 5, 2013 Garda Rep. at 7), but Barrette's counsel has indicated otherwise (Mar. 26, 2013 Hr'g Tr. at 12-13, Mar. 27, 2013 Hr'g Tr. at 61).

4

Garda was able to determine the names of the 36 files.  (Feb. 5, 2013 Garda Rep., App'x 4.)

Some quite clearly indicate that the associated file has nothing to do with this litigation.  (*E.g.*, Feb.

5, 2013 Garda Rep., App'x 4 at 1 ("Newegg Business – Once you Know, You Newegg.pdf").)

Others do not suggest their contents.  (*E.g.*, *id.* at 4-5 ("Dc33.pdf," "Dc34.xls").)  About a dozen

appear to be marginally relevant to Barrette's claim, in response to Lemanski's assertion that he

never received money from MRR, that Lemanski used some portion of MRR's $400,000 in profits

to build a new "6,000 square-foot mansion."  (*Id.* at 3-5; Dkt. 110, Barrette's Mot. to Compel

Property Inspection at 1, 3.)  For example, Garda's list includes "St Clair County Soil Erosion

Permit.pdf," "St Clair County Septic Permit 1526-1.pdf," and "Final Dimensioned Prints/Lemanski

Plans.pdf."  (Feb. 5, 2013 Garda Rep., App'x 4 at 4-5.)

Garda's analysis of Lemanski's work computer also uncovered what the parties refer to as

the "MRR After-Tax Profits Spreadsheet."  (Feb. 5, 2013 Garda Rep. at 5 & App'x 1.)  Although

Lemanski denies having populated the spreadsheet, he admits that he created the spreadsheet and

labeled its columns.  (Apr. 1, 2013 Hr'g Tr. at 45-47.)  The column labels suggest that Lemanski

knew that MRR would profit by reselling resin; they include, "MRR Resin Cost From Supplier,"

"Michigan Resin Sell Price to Customers," and "Total Profit After All Deductions."  (Feb. 5, 2013

Garda Rep., App'x 1.)[2]

In the late afternoon on the day he was terminated from Barrette, Lemanski spoke with

---

[2]Garda also found that Lemanski had installed a pair of software programs on his work computer: Ace Utilities and WhiteCanyon MediaWiper.  (Feb. 8, 2013 Garda Rep.)  Ace Utilities is used for, among other things, erasing internet usage history and usage history of 200 third-party applications.  (*Id.*)  WhiteCanyon MediaWiper is used to "sanitize" removable media like USB drives and external hard drives.  (*Id.* at 7-8.)  Although the programs were installed on Lemanski's computer, Garda did not report that Lemanski used either of the programs on the date of his termination.  (*See generally*, *id.*)

Defendant Turner for 15 minutes over the phone.  (Barrette's Reply to Resp. to Mot. for Sanctions at Pg ID 3647 (phone records), Apr. 4, 2013 Hr'g Tr. at 57 (Turner's cell-phone number), Apr. 1, 2013 Hr'g Tr. at 49-50.)  At the evidentiary hearing, Turner testified that, during that conversation, "[Lemanski] did mention something about getting stuff off his work computer. . . .  I don't  recall if he said it was that day or if he needed to.  I don't recall the exact conversation[,] but I do recall [him] saying something about the work files . . . on his computer."  (Apr. 4, 2013 Hr'g Tr. at 45.)

**B.**

On the day Barrette terminated Lemanski's employment, the company presented Lemanski with a "Separation and Release Agreement" ("Separation Agreement").  Under the Separation Agreement, Barrette offered to pay Lemanski about $15,000 if he agreed to, among other things, return all of Barrette's property, release Barrette from liability, and not apply for employment with Barrette in the future.  (McCann Aff., Ex. 1, Separation Agreement ¶¶ 1, 4, 7, 11.)

The next day, however, Lemanski called McCann and told her that another Barrette employee, Chris Esch, would accuse him of having a financial interest in MRR.  (McCann Aff. ¶ 15; Apr. 1, 2013, Hr'g Tr. at 52.)  Two days later, on June 17, 2011, Barrette's corporate controller, Andre Lavigueur, informed McCann that Barrette was investigating Lemanski's relationship with MRR and that she should revoke the release offer.  (McCann Aff. ¶¶ 16, 23.)  That afternoon, McCann informed Lemanski that Barrette had revoked the Separation Agreement.  (*Id.* ¶ 24.)  According to Lemanski, McCann told him that, based on Esch's statements, Barrette would be investigating his financial interest in MRR and would not honor the Separation Agreement.  (Barrette's Reply to Resp. to Mot. for Sanctions at Pg ID 3641, Lemanski's Timeline.)  Lemanski told McCann that if Barrette intended to revoke the Separation Agreement for this reason, he would

6

consult an attorney.  (*Id.*)

On June 22, 2011, McCann and Lavigueur questioned Lemanski over the phone.  (Barrette's Reply to Resp. to Mot. for Sanctions at Pg ID 3644.)  According to Lemanski, "[Lavigueur] . . . began asking [me] a ton of questions for over 30 minutes about my involvement with MRR and RDI. He stated that since I departed[,] they had obtained some invoices from RDI to MRR that show MRR was making a profit that he didn't like."  (*Id.*)  (Barrette alleges that "RDI," Resin Distribution Inc., was MRR's resin supplier.  (Compl. ¶¶ 23-24.))

A week later, on June 29, 2011, Barrette's President, Jean desAutels, sent an email to Lemanski.  desAutels informed Lemanski that Barrette was investigating "irregularities found with regards to materials you purchased on behalf of Barrette" and asked that Lemanski "stop communicating with employees of [Barrette] in order to not harm [the] investigation."  (Barrette's Reply to Resp. to Mot. for Sanctions at Pg ID 3693.)

Barrette's investigation eventually led the company to have "grave concern[s]" over Lemanski's purchases from MRR.  (Barrette's Reply to Resp. to Mot. for Sanctions at Pg ID 3697.) On July 12, 2011, desAutels relayed these concerns to Lemanski via email:

> Dear Mr. Lemanski:
>
> Please be advised that Barrette Outdoor Living, Inc. ("BOL") is currently conducting a legal and financial audit of its resin suppliers. Our records show that Michigan Resin Representatives, LLC ("MRR") has, since 2010, supplied BOL with prime resins, and that those purchases were executed by you.
>
> Due to your recent departure, BOL possesses very little information verifying the legitimacy of MRR's business operations.  In fact, there exists a grave concern that MRR is not a lawful business and that you and MRR have engaged in a conspiracy to defraud BOL through the submission of false and inflated purchase orders.

7

Accordingly, and to avoid legal action, it is necessary that you meet with BOL representatives to discuss those concerns on Thursday, July 14, 2011 at 3 p.m.  The meeting will be held at BOL's Flint Facility . . . .  If you are willing to attend that meeting, please contact me . . . no later than 1:00 p.m. on Wednesday, July 13, 2011.

Thank you for your cooperation in regard to this very pressing matter. A copy of this request is being sent to your house.

Best Regards,

Jean desAutels
President

(*Id.*)

Around noon the next day, July 13, 2011, Lemanski replied to desAutels as follows:

Jean, Martin,

I am now in receipt of this message.

I am willing to arrange a meeting to discuss these allegations but not without sufficient notice so that both parties can agree to a mutually agreeable time for the meeting.

Additionally, while I completely disagree with these allegations, given the severe nature of these allegations I feel it would be in my best interest to consult with an attorney prior to having any further discussions.

Accordingly, you will be sent an email within a week to propose a time to discuss this matter further.

Thank You,

John Lemanski

(Barrette's Reply to Resp. to Mot. for Sanctions at Pg ID 3696.)

Later that afternoon, Barrette sent Lemanski an email enclosing a document titled "Notice to Preserve Electronically Stored Information."  (Barrette's Reply to Resp. to Mot. for Sanctions at

8

Pg ID 3698-3700.)  The Notice provided that Lemanski was to preserve all electronic storage media, including his cell phones.  (*Id*. at Pg ID 3700.)  Barrette also sent a hard copy of the Notice to Lemanski via overnight FedEx.  (Lemanski's Resp. to Mot. for Sanctions, Ex. C.)

That evening, however, Lemanski purchased a new cell phone and turned in his old cell phone to Sprint, his cell-phone provider.  (Dkt. 98, Lemanski's Resp. to Mot. for Sanctions at 2.)  Lemanski avers,

> After I was let go from my employment with Barrette, my cellular telephone contract came up for renewal.  In order to get a better rate on my cellular telephone service[,] I entered into a new contract and was provided a new phone on July 13, 2011. [Sprint] kept my old phone and I was told that they would dispose of it.

(Lemanski Aff. ¶ 14.)  As for the emailed preservation notice, Lemanski explains that he did not "open or read" it until after he turned in his cell phone.  (Lemanski's Resp. to Mot. for Sanctions at 2.)  And Lemanski did not receive the hard copy sent via FedEx until the next day, July 14, 2011.  (Apr. 1, 2013 Hr'g Tr. at 78.)

## C.

Barrette filed this suit on July 29, 2011.  (Dkt. 1.)  Discovery ensued and on August 30, 2012, Barrette filed a motion to compel, seeking, among other things, an order directing Lemanski to produce his computers, including his personal laptop and cell phone, for imaging.  (Dkt. 40, Barrette's Mot. to Compel at 13.)

Not long thereafter, Lemanski ran "data wiping" software on his personal laptop.  According to Spectrum Computer Forensics & Risk Management ("Spectrum"), a company retained to analyze Lemanski's personal laptop, "[i]n the weeks before his laptop was forensically imaged [on October 31, 2012], J. Lemanski wiped or otherwise tried to obfuscate his activities on his laptop and hard

9

drive by using several file-wiping utilities.  This included, at a minimum, CCleaner and Eraser and possibly Killbox."  (Barrette's Mot. for Sanctions, Ex. J, Jan. 10, 2013 Spectrum Report at 6.)  In particular, on September 6, 2012, Lemanski used "Eraser 6": an application for deleting and overwriting data on a computer's hard drive.  (Jan. 10, 2013 Spectrum Report at 3.)  Then on September 23 and September 26, 2012, Lemanski used "CCleaner" to delete approximately 270,000 files from his personal laptop.  (Jan. 10, 2013 Spectrum Report at 2.)  According to Specturm, CCleaner is considered to be an "anti-forensic" application that can "securely delete" files that log a user's computer activity.  (Jan. 10, 2013 Spectrum Report at 1.)  Spectrum was, however, able to find artifacts of deleted folders entitled "Files From Work Computer" and "Crystals Stuff."  (Jan. 10, 2013 Spectrum Report at 4.)  ("Crystal" is Lemanski's sister.  (Apr. 1, 2013 Hr'g Tr. at 102.))

Lemanski does not deny using Eraser 6 and CCleaner on his personal laptop on the dates that Spectrum identified.  (Apr. 1, 2013 Hr'g Tr. at 70.)  He does, however, deny that he permanently deleted any files related to this case.  Lemanski explains that he merely copied "wholly irrelevant files (electronic video games, pictures and a video file) from his [P]ersonal [L]aptop onto an external hard drive" and then used "commonly available" software to remove those files from his personal laptop.  (Lemanski's Resp. to Mot. for Sanctions at 3; Apr. 1, 2013 Hr'g Tr. at 93.)  In support of his claim, he offers the expert report of James Carter, an information technology professional who analyzed the external hard drive and the contents of the personal laptop.  The parties agree that Carter found the following: (1) the external drive was connected to Lemanski's personal laptop, (2) evidence on the external drive indicates that Lemanski transferred files from the personal laptop to the external drive on September 22, 2012, (3) the external drive contains 21,206 files, and (4) the external drive contains folders with names akin to "Files From Work Computer Backup" and

10

"Crystals Stuff Backup."  (Apr. 1, 2013 Hr'g Tr. at 21, 23-24; *see also* Lemanski's Evid. Hr'g Ex. 1, Carter Rep.)

Prior to learning of Carter's finding that the external hard drive contained about 21,000 files, Barrette had elicited testimony from Stott Matthews, an expert from Spectrum, about whether, forensically, it could be established that the external drive contained all 270,000 files that Lemanski permanently deleted from his personal laptop.  Matthews explained that with certain indicia (e.g., a match with the number of files, a match with the number of folders, and date-related metadata), one could have some confidence that the files copied onto the external drive matched those erased from the personal laptop.  (*See* Mar. 26, 2013 Hr'g Tr. at 56, 58.)  He emphasized, however, that he could not imagine a scenario in which he would feel comfortable testifying that the external hard drive contained all the documents wiped from the personal laptop.  (Mar. 27, 2013 Hr'g Tr. at 35-36; *see also* Barrette's Reply to Resp. to Mot. for Sanctions, Ex. H, Mar. 18, 2013 Email from Matthews to Barrette's Counsel.)

## II.

"'Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'"  *Forest Labs., Inc. v. Caraco Pharm. Labs., Ltd.*, No. 06-13143, 2009 WL 998402, at *1 (E.D. Mich. Apr. 14, 2009) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)).  A district court has "inherent power to exercise broad discretion" in imposing sanctions for spoliation. *Adkins v. Wolever* (*Adkins II*), 554 F.3d 650, 653 (6th Cir. 2009) (en banc).  Even where, as here, a federal court exercises diversity jurisdiction, federal law provides the legal standard.  *Adkins II*, 554 F.3d at 653.

11

Specifically, a party seeking a sanction for the destruction of evidence must show (1) "'that the party having control over the evidence had an obligation to preserve it at the time it was destroyed;'" (2) that the evidence was destroyed with a "'culpable state of mind;'" and (3) "'that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.'" *See Adkins v. Wolever* (*Adkins III*), 692 F.3d 499, 503-04 (6th Cir. 2012) (quoting *Beaven v. United States Dep't of Justice*, 622 F.3d 540, 553, 554 (6th Cir. 2010) and indicating that *Beaven*'s requirements for an adverse inference spoliation sanction also apply to other spoliation sanctions). In the spoliation context, destroyed evidence is "relevant" if "'a reasonable trier of fact could conclude that the lost evidence would have supported the claims or defenses of the party that sought it.'" *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 531 (D. Md. 2010) (quoting *Thompson v. U.S. Dep't of Hous. & Urban Dev.*, 219 F.R.D. 93, 101 (D. Md. 2003)).

As the summary of facts suggest, Barrette seeks case-terminating sanctions for (1) Lemanski's deletion of files from his work computer, (2) disposal of his cell phone, and (3) wiping of his personal laptop. The Court considers these three acts in turn. The first does not warrant a spoliation sanction, but the second and third do.

## A.

To justify a sanction against Lemanski for deleting files from his work computer, Barrette must show that Lemanski was under a duty to preserve those files on the day he was terminated. *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) ("It goes without saying that a party can only be sanctioned for destroying evidence if it had a duty to preserve it.").

"In most cases, the duty to preserve evidence is triggered by the filing of a lawsuit." *Cache*

*La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 621 (D. Colo. 2007); *see also Linnebur v. United Tel. Ass'n, Inc.*, No. 10-1379, 2012 WL 2370110, at *1 (D. Kan. June 21, 2012) ("[M]ost[] commonly, a party is deemed to have notice of pending litigation if the party has received a discovery request, a complaint has been filed, or any time a party receives notification that litigation is likely to be commenced.").  Here, the record is plain that when Barrette terminated Lemanski's employment, there was no lawsuit pending and Barrette had not provided Lemanski any notice of suit.

Explicit notice, however, is not an absolute prerequisite: "[a]s a general matter, it is beyond question that a party to civil litigation has a duty to preserve relevant information, including [electronically stored information], when that party 'has notice that the evidence is relevant to litigation or . . . should have known that the evidence may be relevant to future litigation.'" *John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008) (quoting *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)); *see also Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 591 (4th Cir. 2001) ("The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." (citing *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998))).

Barrette asserts that Lemanski "should have reasonably anticipated litigation" when he deleted files from his work computer, because "during the entire perpetration of the pass-through scheme (i.e., January 1, 2010 through June 14, 2011), Lemanski was aware that he could have been caught . . . ."  (Barrette's Mot. for Sanctions at 12; *see also* Mar. 27, 2013 Hr'g Tr. at 53 ("[A]s we said in our papers, [Lemanski's] mere involvement in this type of a scheme, I think should be enough to put somebody on notice that this might cause me problems down the road.").)  Although

this argument has some appeal, the Court ultimately finds it insufficient.

As an initial matter, the broad rule implied by Barrette cannot hold generally. There are numerous reasons for a reasonable person to believe that his conduct, while exposing him to liability, will nonetheless not result in suit: the conduct is not clearly wrongful; if clearly wrongful, the likelihood of harm is small; if the small risk of harm comes to fruition, the harm will not be severe; or the remedies available by suit are outweighed by costs associated with litigation. *See Silman v. Associates Bellemeade*, 294 Ga. App. 764, 767, 669 S.E.2d 663, 667 (2008) ("'A lot of times people just let things go; they fall off decks and get hurt, go get treated, and never sue anybody because it's just not something they'd do in their normal course of business.'" (quoting trial court)), *aff'd*, 286 Ga. 27, 685 S.E.2d 277 (2009).

Granted, in this particular case, *if* Barrette's allegations are true—that, for his financial gain, Lemanski caused Barrette to pay $400,000 more than necessary for resin—a reasonable person in Lemanski's position would have expected that *if* his employer found out about the scheme, it would seek to recover the money, perhaps through litigation. But the first "if" statement asks the Court to accept that Lemanski participated in an alleged pass-through scheme. Although Barrette has some strong evidence of this, including an affidavit from Defendant Turner detailing Lemanski's involvement (Dkt. 115, Barrette's Supplemental Br. in Supp. of Mot. for Sanctions, Ex. A, Turner Aff.), no summary judgment motions have been filed and Lemanski's participation and the impropriety of the business arrangement remain to be proven.

The second "if" statement is even more problematic for Barrette. It asks the Court to find that a reasonable person in Lemanski's position would have expected Barrette to discover his participation in the scheme on June 14, 2011. But Barrette has not produced compelling evidence

14

of this.  At the evidentiary hearing, Barrette pointed out that months prior to Lemanski's termination, people at Barrette had inquired into whether Lemanski had a financial interest in MRR.  (Apr. 1, 2013 Hr'g Tr. at 41; *see also* Barrette's Reply to Resp. to Mot. for Sanctions at Pg ID 3641, Lemanski's Timeline.)  To Barrette, a reasonable person faced with this inquiry would have thought that the company was "hot on [my] trail."  (Mar. 27, 2013 Hr'g Tr. at 53.)  This is not implausible. But equally plausible is that a reasonable person would  infer the case was cold: Barrette did not follow up on the inquiry in the several months that Lemanski remained employed with the company. Barrette did not even make any inquiries about MRR on the day it severed ties with Lemanski – and, in fact, offered him a severance agreement.

Stronger for Barrette is Turner's testimony that in the late-afternoon on the day he was terminated, Lemanski told her about files on his work computer.  According to Turner, "[Lemanski] did mention something about getting stuff off his work computer. . . .  I don't  recall if he said it was that day or if he needed to.  I don't recall the exact conversation[,] but I do recall [him] saying something about the work files . . . on his computer."  (Apr. 4, 2013, Hr'g Tr. at 45; *see also* Turner Aff. ¶ 40 ("On June 14, 2011, Lemanski called me and informed me that he had been terminated from Barrette.  He also stated that I should not tell [Defendant] Wells that he had been terminated.").)  A reasonable inference from Turner's statement is that Lemanski was concerned about Barrette discovering inculpatory documents on his work computer.

Still, Turner's testimony was equivocal and her recall of the conversation lacks detail.  And, more importantly, although Lemanski may have then had some concern about being discovered, the totality of the record indicates that his concern was not great.  If Lemanski had in fact participated in the fraudulent scheme since early 2010, then he would have also known that Barrette had not

15

investigated him in the following year-and-a-half.  Lemanski also knew that he was terminated only because his position had been eliminated as a result of downsizing.  A reasonable person would also infer that because he was being offered money under a separation agreement, the company had no knowledge of the alleged scheme.  Lemanski was also aware that Barrette had given him access to his computer to delete certain files.  A reasonable person would infer that if the company suspected the alleged scheme in the slightest, it would not allow access to a potential source of evidence.

"Ultimately, [a] court's decision [regarding when a duty-to-preserve attaches] must be guided by the facts of each case."  *Cache La Poudre*, 244 F.R.D. at 621.  The question of whether Lemanski was under a duty to preserve as of June 14, 2011 is certainly close.  As the Court has made apparent, however, it finds the following facts most persuasive: Barrette had no knowledge of the pass-through scheme on June 14, 2011, it was not then investigating Lemanski, and the company had provided Lemanski with no notice—even equivocal notice—that it intended to initiate legal proceedings.  *See Webb v. Jessamine County Fiscal Court*, No. 5:09-314, 2011 WL 3652751, at \*5 (E.D. Ky. Aug. 19, 2011) ("District courts have consistently looked for communication, whether it be written or verbal, by the plaintiff threatening to initiate litigation or announcing litigation against a defendant as the point at which a defendant has a duty to preserve relevant evidence." (citing cases)); *see also Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 510 (D. Md. 2009) ("The mere existence of a dispute does not necessarily mean that parties should reasonably anticipate litigation or that the duty to preserve arises."); *Cache La Poudre*, 244 F.R.D. at 621 ("[T]he duty to preserve relevant documents should require more than a mere possibility of litigation."). The Court therefore finds that Lemanski was not under a duty to preserve at the time he deleted files from his work computer.

16

Barrette's alternative duty-to-preserve theory does not warrant a different conclusion. Barrette relies on *Beaven v. U.S. Dept. of Justice*, 622 F.3d 540 (6th Cir. 2010) to argue that Lemanski's intentional destruction of relevant evidence on June 14, 2011 implies that he then anticipated litigation. (Barrette's Mot. for Sanctions at 12.) In *Beaven*, however, not only did the defendants intentionally destroy relevant evidence, but the destruction occurred after (1) a grievance had been filed against the defendants, (2) the defendants had offered assistance to individuals in filing tort claims if the defendants' internal investigation ultimately supported the allegations, and (3) the parties had arbitrated the alleged harmful conduct. *Id.* at 545-46; *see also id.* at 554 ("[W]e accept the district court's findings that the Defendants were sufficiently on notice of potential claims to have an obligation to preserve the evidence as a result of the Defendants' repeated statements that concerned persons could file tort claims, *and* that the later destruction [of evidence] . . . was intentional." (emphasis added)). As discussed, Lemanski did not have comparable notice of suit on the day he was terminated.

Accordingly, the Court finds that Barrette has not carried its burden in showing that Lemanski was under a duty to preserve evidence when he deleted files from his work computer.[3]

---

[3]The Court notes that there is also a substantial question about how many of the files Garda identified were actually deleted by Lemanski. McCann avers that Lemanski deleted files during a 15-minute period. (McCann Aff. ¶ 13.) Garda's report, however, provides that 4,481 files were deleted during a 12-hour period. (Feb. 8, 2013 Garda Rep. at 7.) Further, "[s]ome of these files were "deleted automatically by the system." (*Id.*) Garda's report also provides that the 36 office-type files were manually deleted during an over-three-hour-period between 7:44 and 11:06 a.m. (*Id.*)

**B.**

Circumstances had changed, however, by the time Lemanski disposed of his cell phone. Two days after Lemanski's termination, McCann told Lemanski that Barrette would be investigating his financial interest in MRR and would be revoking the Separation Agreement.  (Barrette's Reply to Resp. to Mot. for Sanctions at Pg ID 3641, Lemanski's Timeline; *see also* McCann Aff. ¶¶ 23-24.)  Five more days later, Barrette's corporate controller called Lemanski and, in Lemanski's words, asked "a ton of questions for over 30 minutes about [Lemanski's] involvement with MRR and RDI."  (Barrette's Reply to Resp. to Mot. for Sanctions at Pg ID 3641, Lemanski's Timeline.)  Lemanski says that Lavigueur told him that, since his departure, Barrette had reviewed invoices that evidenced that "MRR was making a profit that [Lavigueur] didn't like."  (*Id.*)  A week after that, Barrette's president became involved.  desAutels sent Lemanski an email with the ominous statement that Barrette was investigating "irregularities found with regards to materials you purchased on behalf of Barrette."  (Barrette's Reply to Resp. to Mot. for Sanctions at Pg ID 3693.)

Then, the day before Lemanski turned in his cell phone, he received another email from Barrette's president informing him that Barrette had  "grave concern[s]" that he and MRR had "engaged in a conspiracy to defraud [Barrette] through the submission of false and inflated purchase orders."  (Barrette's Reply to Lemanski's Resp. to Mot. for Sanctions at Pg ID 3697.)  It is true, that the same email granted Lemanski the opportunity to meet and "avoid legal action."  (*Id.*)  And, viewed in isolation, this statement could reasonably imply that litigation was not imminent.  But the statement must be taken in context of Barrette's escalating concern as expressed to Lemanski in the prior weeks.  Indeed, Lemanski reasonably viewed the July 12, 2011 email threatening enough to decline the meeting until he "consult[ed] with an attorney."  (*Id.* at Pg ID 3696.)

18

Thus, by the time he turned in his cell phone, Lemanski should have been aware of the following: (1) the Separation Agreement had been revoked because of concerns over his involvement with MRR, (2) this concern led Barrette's corporate controller to ask "ton[s] of questions," (3) when the concerns were not quelled by Lemanski's answers, Barrette's president became involved, (4) Barrette's president expressed "grave concern[s]" over "a conspiracy to defraud," and (5) he utilized his cell phone to communicate with MRR representatives Turner and Wells. Lemanski therefore should have known that he had a duty to preserve his cell phone at the time he decided to replace it and turned it in to Sprint on July 13, 2011.

The other requirements for a spoliation sanction are also met. *See Kronisch v. United States*, 150 F.3d 112, 127 (2d Cir. 1998) ("Once a court has concluded that a party was under an obligation to preserve the evidence that it destroyed, it must then consider whether the evidence was intentionally destroyed, and the likely contents of that evidence."). Although Lemanski maintains that his decision to sign a new cell-phone contract was an innocent or negligent act, Barrette has shown that Lemanski discarded his cell phone in bad faith, i.e., "for the purposes of depriving [Barrette] of the evidence" it contained, *Victor Stanley*, 269 F.R.D. at 530.

The timing dominates the culpability inquiry: a few hours after acknowledging that Barrette had made "severe allegations" justifying legal counsel, Lemanski went to Sprint to turn in his cell phone. Lemanski's explanations for changing his cell phone contract at that particular moment are unconvincing. Lemanski avers that he entered a new cell-phone contract to save money. (*See* Lemanski Aff. ¶ 14.) Yet Barrette's evidence indicates that Lemanski actually paid more under his new contract and, at the evidentiary hearing, Lemanski conceded this point. (Barrette's Reply to Resp. to Mot. for Sanctions at 2 & Ex. B, Lemanski's Financial Records; Apr. 1, 2013 Hr'g Tr. at

19

58.)  Lemanski also implies that he turned in his old cell phone as a condition for receiving a new phone.  (Lemanski's Resp. to Mot. for Sanctions at 2; Lemanski Aff. ¶ 14.)  But Barrette has submitted an affidavit from Sprint's "Lead Trial Coordinator" stating, "Sprint does not require the subscriber to recycle or turn in old handsets/cell phones."  (Barrette's Reply to Resp. to Mot. for Sanctions, Ex. C, Ramos Aff. ¶ 4.)  Indeed, at the evidentiary hearing Lemanski admitted that he knew he was not required to turn in his cell phone at the time of entering a new contract.  (Apr. 1, 2013 Hr'g Tr. at 59.)  While this temporal proximity is arguably enough to  justify a finding of bad faith, there is additional evidentiary support.

First, even accepting Lemanski's claim that he did not "open or read" Barrette's email attaching the "Notice to Preserve Electronically Stored Information" prior to turning in his cell phone, Lemanski admits that he saw a hard copy of the Notice the very next day.  (Lemanski's Resp. to Barrette's Mot. for Sanctions at 2; Apr. 1, 2013 Hr'g Tr. at 78.)  Yet Lemanski testified that, after seeing the Notice, he made no efforts to retrieve the cell phone from the Sprint store.  (Apr. 1, 2013 Hr'g Tr. at 79.)

Second, although the Court acknowledges that Lemanski's counsel demonstrated that Turner's affidavit is at multiple points inconsistent with an earlier statement she provided to Barrette, the Court does find that Turner's testimony regarding her conversations with Lemanski about their cell phones to be consistent with the conclusion that Lemanski disposed of his cell phone in bad fath.  In particular, Turner testified that some time before turning in his cell phone to Sprint, Lemanski told her that his phone was going to be destroyed and that Wells and Turner should also destroy their cell phones.  (Apr. 4, 2013 Hr'g Tr. at 51.)  Tuner recalls that Lemanski stated, "if there was no evidence, there is no evidence," and, "[w]ithout the cell phones, without any other evidence,

20

what can they prove?" (*Id.* at 52.)

Given the highly suspect timing of Lemanski's decision to obtain a new cell phone, no convincing explanation for needing a new cell phone at that very moment, Lemanski's failure to make any effort to retrieve his phone after receiving notice from Barrette to preserve electronic storage the very next day, and Turner's testimony, the Court concludes that Lemanski acted in bad faith by discarding his cell phone on July 13, 2011.

It follows from this finding that Barrette has also carried its burden on the last element for a spoliation sanction: that the information on Lemanski's cell phone was relevant to Barrette's claims or defenses "such that a reasonable trier of fact could find that it would support that claim or defense," *Adkins III*, 692 F.3d at 503-04 (internal quotation marks omitted). This is because "[w]hen evidence is destroyed in bad faith[,] . . . that fact alone is sufficient to demonstrate relevance." *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 431 (S.D.N.Y. 2004) (citing *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 109 (2d Cir. 2002)); *see also Victor Stanley*, 269 F.R.D. at 533 ("Defendants' willful, bad faith conduct allows this Court to presume relevance and prejudice"); *Chrysler Realty Co., LLC v. Design Forum Architects, Inc.*, No. 06-11785, 2009 WL 5217992, at *5 (E.D. Mich. Dec. 31, 2009) (quoting *Zubulake*'s relevance presumption with approval); *Forest Labs., Inc. v. Caraco Pharm. Labs., Ltd.*, No. 06-13143, 2009 WL 998402, at *7 (E.D. Mich. Apr. 14, 2009) (same); *but see Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 617 (S.D. Tex. 2010) ("The Fifth Circuit has not explicitly addressed whether even bad-faith destruction of evidence allows a court to presume that the destroyed evidence was relevant or its loss prejudicial."). Lemanski makes no effort to rebut the presumption of relevance other than to imply that the law does not permit the Court to "presume

21

relevant evidence was on the old cell phone." (Lemanski's Resp. to Mot. for Sanctions at 14.) The foregoing authorities say otherwise. Additionally, Lemanski, through counsel, conceded that the cell phone contained text messages between him, Wells, and Turner. (Apr. 1, 2013 Hr'g Tr. at 12.)

Barrette has therefore established each of the required spoliation-sanction elements for Lemanski's failure to preserve his cell phone. Before discussing the appropriate sanction, however, the Court addresses Barrette's claim that Lemanski spoliated evidence on his personal laptop.

## C.

Here, the Court's analysis is relatively straightforward: Lemanski used scrubbing software to wipe 270,000 files from his personal laptop while a discovery request for the laptop was pending in this case, and he has not provided a convincing reason for doing so at that time.

As discussed, Lemanski was under a duty to preserve evidence at least by July 13, 2011. Even if that conclusion is debatable, it is beyond dispute that he was under a duty to preserve evidence by September 2012. By that time, this lawsuit had been ongoing for over a year. *Victor Stanley, Inc.*, 269 F.R.D. at 522 ("[T]he duty [to preserve] exists, for a defendant, at the latest, when the defendant is served with the complaint.").

Regarding culpability, temporal proximity again plays a large role. One week after Barrette filed a motion seeking a court order directing Lemanski to produce his personal laptop for imaging, Lemanski decided to use Eraser 6 on his laptop—an application that overwrites data on a computer's hard drive. Then, about three weeks later, Lemanski ran CCleaner which made 270,000 files on his personal laptop unrecoverable. Lemanski's explanations are again questionable. Lemanski testified that he copied files from his laptop to an external drive and then ran cleansing software on his laptop, because he believed that, if the personal laptop had less data, Spectrum's imaging and

22

keyword searching would be less expensive.  (Apr. 1, 2013 Hr'g Tr. at 93.)  The Court, however, finds persuasive Barrette's counsel's explanation that the cost of imaging a hard drive depends on its capacity, not its content, and that keyword searching through more data increases computer rather than expert time, and therefore, it too does not significantly increase costs.  Lemanski, having built his own computers, touted his computer knowledge, and directed Barrette's IT at the Flint facility, would likely understand that wiping files from a hard drive would not significantly reduce the expense of imaging and keyword searching.  (Barrette's Mot. for Sanctions at 3 & Exs. A, B, C, D; *see also* Apr. 1, 2013 Hr'g Tr. at 33-37.)  And even if there is significant cost reduction from data deletion, the Court would have expected that Lemanski would have first informed his counsel of his plan.

Further, although there are some credibility issues, the Court again finds that Turner's testimony is consistent with the inference that Lemanski deleted files from personal laptop in bad faith.  She stated that,

> [In the Spring of 2012, Lemanski] said that we could purchase a cleaner.  He had been looking at some cleaners on line.  He cleaned his computer.  There was a C C cleaner that we could purchase that would clean it.  If I didn't know how to do it he could do it for me.

(Apr. 4, 2013 Hr'g Tr. at 53.)

Finally, the Court notes that it has already concluded that Lemanski acted in bad faith in discarding his cell phone.  If Lemanski was then acting to deprive Barrette of evidence, it is not a stretch to conclude that he acted with the same state of mind when wiping his personal laptop.

Because Lemanski acted in bad faith when using Eraser 6 and CCleaner, Barrette is again entitled to a presumption of relevance. *Zubulake*, 229 F.R.D. at 431; *Victor Stanley, Inc.*, 269 F.R.D. at 533; *Chrysler Realty*, 2009 WL 5217992, at *5; *Forest Labs.*, 2009 WL 998402, at *7.  "[I]n order

23

to rebut the presumption of relevance, the alleged spoliator must present *clear and convincing* evidence demonstrating that the spoliated material or documents were of minimal or little import." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 803 F. Supp. 2d 469, 499 (E.D. Va. 2011). "Absent such a heavy burden, spoliators would almost certainly benefit by having destroyed the documents, since the opposing party could probably muster little evidence concerning the value of papers it never saw." *Id.* (internal quotation marks and citation omitted).

Lemanski has not carried his heavy burden. He testified that he did not delete relevant files from his personal laptop and that the laptop did not contain documents pertaining to MRR. (Lemanski's Resp. to Mot. for Sanctions at 3; Apr. 1, 2013 Hr'g Tr. at 93, 103.) But upon viewing the record more completely, it is apparent that this attestation does not constitute clear and convincing evidence. *See E.I. du Pont de Nemours & Co.*, 803 F. Supp. 2d at 499 ("[A] party who is guilty of, say, intentionally shredding documents in order to stymie the opposition, should not easily be able to excuse the misconduct by claiming that the vanished documents were of minimal import." (internal quotation marks and citation omitted)). First, there is the post-hoc nature of the explanation: at no point prior to deleting the files, did Lemanski check to see if anyone, even his own counsel, would object to or caution against a unilateral characterization of which files were and were not relevant to this litigation. Second, Lemanski's testimony is contradicted by Turner's testimony that Lemanski directed her and Defendant Wells to destroy information relevant to this suit. (Apr. 4, 2013 Hr'g Tr. at 53.) Third, even Lemanski's expert could not fully corroborate Lemanski's testimony. Although Carter arguably found that Lemanski copied files to the external drive on September 22, 2012, this does not account for Lemanski's use of Eraser 6 on September 6, 2012. (*Compare* Jan. 10, 2013 Spectrum Report at 3, *with* Apr. 1, 2013 Hr'g Tr. at 21.) And

24

Carter's findings show that the external drive contains less than one-tenth of the files wiped from the personal laptop. (*Compare* Jan. 10, 2013 Spectrum Report at 6, *with* Carter Rep. at 3.) Undoubtedly, the bulk of the 250,000 unaccounted for files are system or program files that are not related this suit. But the problem is that, because of the wiping, no forensic analysis can show, clear and convincingly at least, that within those 250,000 files there are not a handful of files that support Barrette's claims. (*See* Mar. 27, 2013 Hr'g Tr. at 35-36; Barrette's Reply to Resp. to Mot. for Sanctions, Ex. H, Mar. 18, 2013 Email from Matthews to Barrette's Counsel.) It is Lemanski, not Barrette, that must bear the risk of the uncertainty. *See Kronisch*, 150 F.3d at 128 ("[H]olding the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence . . . would allow parties who have intentionally destroyed evidence to profit from that destruction.").

In sum then, Barrette has shown that spoliation sanctions are warranted for Lemanski's permanent deletion of relevant files from his personal laptop.

**D.**

"[A] proper spoliation sanction should serve both fairness and punitive functions." *Adkins II*, 554 F.3d 650, 652 (6th Cir. 2009). Because a spoliator's culpability falls within a continuum of fault "ranging from innocence through the degrees of negligence to intentionality," "the severity of a sanction may, depending on the circumstances of the case, correspond to the party's fault." *Id.* at 552-53 (quotation marks and citation omitted). But, and critical in this case, a court must also consider the prejudice to the party that must proceed without the spoliated evidence. *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d 456, 467 (S.D.N.Y. 2010) ("[F]or more severe sanctions—such as dismissal, preclusion, or the imposition of an adverse

inference—the court must consider, in addition to the conduct of the spoliating party, whether any missing evidence was relevant and whether the innocent party has suffered prejudice as a result of the loss of evidence.") *abrogated in part by Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135 (2d Cir. 2012); *Jain v. Memphis Shelby Cnty. Airport Auth.*, No. 08-2119, 2010 WL 711328, at *3 (W.D. Tenn. Feb. 25, 2010) ("The severity of the sanction should correspond to the actual prejudice suffered by the party who has been denied discovery."). Thus, a spoliation sanction "should be designed to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) (internal quotation marks omitted).

The Court agrees with Barrette that Lemanski's bad faith in disposing his cell phone and wiping files from his personal laptop weighs in favor of a default judgment. But the Court also believes that the scale tips back some when considering prejudice.

Beginning with the personal laptop, given Lemanski's computer savvy, it is likely that Lemanski destroyed relevant information; but it is also likely that Lemanski never stored a large amount of documentation crucial to Barrette's claims on his personal laptop in the first place (or else he wiped that documentation before the duty to preserve attached). To this end, the Court finds credible Lemanski's testimony that he did not store emails on his personal laptop, but instead sent and received email through his email provider's website. (Apr. 1, 2013 Hr'g Tr. at 89-90.) Additionally, the Court notes that some of the communications between Lemanski, Turner, and Wells about MRR, if any, were done through in-person meetings or phone calls. (*See, e.g.*, Turner

Aff. ¶¶ 5, 9, 15, 29, 44, 45.)  It is true that Lemanski's personal laptop contained documents pertaining to the construction of his home.  (Apr. 1, 2013 Hr'g Tr. at 103.)  And the Court acknowledges that those documents would likely have been relevant, in the broader Fed. R. Civ. P. 26(b) sense, to Barrette's claim that Lemanski used MRR's profits to build his home.  But the Court is aware of some of Barrette's other discovery efforts and thus knows that much of this evidence is still obtainable, admittedly at greater time and expense to Barrette, from other sources.  In fact, Barrette says that it has "obtained affidavits showing that Lemanski paid various contractors and suppliers over $100,000.00 in cash." (Dkt. 110, Barrette's Mot. to Compel Property Inspection at 1.)  Lemanski has provided numerous interrogatory responses pertaining to the construction of his home and the Court recently entered an order allowing Barrette to inspect the home.  (Dkt. 123.)

Similarly, the Court believes that Lemanski's cell phone contained relevant information, but has some doubt about whether it contained information critical to Barrette's case when Lemanski turned it into Sprint.  Given this Court's duty-to-preserve findings, any text messages or internet history that Lemanski deleted from his cell phone prior to his termination from Barrette would not be a basis for a spoliation sanction.  And the Court has no information about how long Lemanski's phone would have stored message or internet history absent manual deletion.  As for messages Lemanski sent or received between the time he was terminated and when he discarded the phone, it is notable that Turner testified that, during this period, she did not frequently communicate with Lemanski via text message.  (Apr. 4, 2013 Hr'g Tr. at 49.)

Additionally, the Court cannot overlook the significant other evidence that Barrette has at its disposal.  Although there was delay, Turner has now produced her cell phones to Barrette.  (Apr. 4, 2013 Hr'g Tr. at 14-15.)  Turner has also produced a laptop used in the course of operating MRR.

27

(Apr. 4, 2013 Hr'g Tr. at 12, 14-15.)  The laptop may contain emails that Lemanski sent to Turner during the alleged scheme.  (*Id.* at 65; *see also id.* at 53.)  As noted at the outset, Barrette possesses evidence that Lemanski created the "MRR After-Tax Profits Spreadsheet," which suggests that Lemanski knew that MRR would make a profit from selling resin for more than its purchase price. Most significantly, however, is that Barrette has procured an affidavit, and some testimony, from Defendant Turner that directly supports many of its allegations of a fraudulent pass-through scheme. For example, Turner's affidavit provides,

> On or about January 19, 2010 Lemanski called me and advised [me or both Wells and me] that Lemanski had arranged for one of Barrette's current resin suppliers, Resin Distribution Inc. ("RDI"), to sell resin to a company that Wells and I would form.

> Lemanski suggested to me that the name of this company should be Michigan Resin Representatives, LLC ("MRR") and that Lemanski would receive 50% of the profits of MRR, Wells would receive 25% of the profits from MRR, and I would receive 25% of the profits of MRR.

(Turner Aff. ¶¶ 9, 10.)

In short, the Court is not convinced that Lemanski's destruction of evidence will deprive Barrette of its day in court.  Proving its case will now come at increased costs and time, but that prejudice can be remedied through relief short of default judgment.  *See Gentex Corp. v. Sutter*, 827 F. Supp. 2d 384, 391 (M.D. Pa. 2011) ("In choosing the proper sanction, courts must select the least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by the victim." (internal quotation marks and citation omitted)); *Jain*, 2010 WL 711328, at *3 (noting that "dismissal is a sanction 'of last resort,' a 'drastic remedy' to 'be imposed only in extreme circumstances.'   A court should consider alternative sanctions, individually or in combination, which might achieve the same prophylactic, punitive, and remedial objectives."

28

(citations omitted)).

It remains, however, that the Court cannot condone Lemanski's conduct.  Lemanski should have known that Barrette would soon file suit when he discarded his cell phone; and he made no effort to retrieve the phone after receiving Barrette's preservation notice the next day.  Then, without checking with his counsel or Barrette, Lemanski wiped 270,000 files from his personal laptop shortly after Barrette sought an order compelling Lemanski to produce the laptop for imaging. Severe sanctions, as set forth below, are therefore justified.  *See Adkins II*, 554 F.3d at 652 ("[T]he severity of a sanction may, depending on the circumstances of the case, correspond to the party's fault").

## III.

For the foregoing reasons, this Court RECOMMENDS that Barrette's Motion for Sanctions Against John H. Lemanski, Jr. for His Intentional Destruction of Evidence and Violation of this Court's Discovery Order (Dkt. 91) be GRANTED IN PART.   In particular, this Court RECOMMENDS that Lemanski be sanctioned as follows: (1) Lemanski shall pay Barrette $25,000.00 to compensate Barrette for some of the fees and costs Barrette incurred in bringing its spoliation motion; (2) Lemanski shall pay Barrette $10,000.00 for Barrette's increased expenses in conducting discovery and proceeding in this litigation without the spoliated evidence; and (3) at trial, there will be an adverse inference that Lemanski's cell phone and personal laptop contained information unfavorable to Lemanski, including that he was involved with MRR.  The Court further RECOMMENDS that if this Report and Recommendation is adopted, Lemanski must pay Barrette within 60 days of adoption.

29

## IV.

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson            
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  April 26, 2013

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on April 26, 2013.

s/Jane Johnson            
Deputy Clerk
