UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


BARRETTE OUTDOOR LIVING, INC.

               Plaintiff,

     v.

                                        Case No. 11-13335
MICHIGAN RESIN REPRESENTATIVES, LLC;     Honorable Julian Abele Cook, Jr.
JOHN H. LEMANSKI, JR.; LISA J. WELLS; and
TAMARA L. TURNER

               Defendants.


ORDER

    The Plaintiff, Barrette Outdoor Living, Inc. ("Barrette Outdoor"), commenced this action on

July 29, 2011, by accusing the Defendants, Michigan Resin Representatives, LLC ("Michigan

Resin") et al, of a variety of tortious activities (i.e., fraud, violations of fiduciary responsibilities,

interference with an ongoing business activity, conspiracy, and violations of the Racketeer

Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961 et seq.).[1]

    Currently before the Court are the Plaintiff's motions for summary judgment pursuant to Fed.

R. Civ. P. 56(c) that are directed against two of the Defendants, John H. Lemanski and Lisa J. Wells.

(ECF Nos. 148 and 155).

I.

    This case has been contentiously and exhaustively litigated for over three years. The genesis

of this dispute–which has been described in some of the prior orders by this Court–centers around

---

[1] As of August 6, 2013, none of the Defendants in this matter are represented by counsel.

an alleged "pass-through" scheme that was designed by one of the Plaintiff's former employees, John Lemanski. In essence, the Plaintiff alleges that Lemanski, while acting in his official capacity as its purchasing manager, created a "shell" company (to wit, Michigan Resin) for the primary purpose of reselling resin to his employer at inflated prices.

In its complaint, the Plaintiff maintains that Lemanski received a substantial amount of Michigan Resin's profits in the form of cash kickbacks from the other Defendants, Lisa Wells and Tamara Turner.  As a senior buyer for the Plaintiff, Lemanski was primarily responsible for negotiating with producers and distributors of resin in order to secure the most competitive price under the prevailing market conditions. If and when his goal was achieved, Lemanski was obliged to communicate this information to the Plaintiff's general manager, Mario Gaudreault, in the form of a proposed purchase order. However, as a prerequisite to obtaining the approval of a proposed purchase order, Lemanski was obliged to advise Gaudreault of the salient facts (such as the quantity and price of the resin being ordered, as well as the identity of the prospective seller). At the conclusion of this administrative process, Lemanski was required to transmit an approved purchase order to the designated seller.

In February 2010, Wells and Turner formed Michigan Resin, a limited liability company. Shortly thereafter, the Plaintiff alleges that Lemanski discontinued his practice of competitively negotiating for resin on behalf of Barrette Outdoors, and, instead, began to fraudulently steer business to Michigan Resin. According to the accusations within the complaint, the general operation of this scheme was relatively straightforward. First, through the use of the Plaintiff's computer system, Lemanski would generate a request to Michigan Resin (c/o Resin Distribution Inc. ("RDI"), for a resin product at a certain price. Once received by Michigan Resin, Turner would

2

forward the order to RDI for fulfillment. In the meantime, Lemanski would return to the Plaintiff's computer system and alter the original purchase order by increasing the amount to be paid to Michigan Resin. After taking delivery of the product, the Plaintiff would remit payment to Michigan Resin in the amount reflected on the revised purchase order. Michigan Resin, acting solely as an intermediary between the Plaintiff and RDI, was paid a commission by RDI in addition to any markup that it received on the sale.

In its complaint, the Plaintiff maintains that this scheme was repeated over the course of 14 separate transactions, resulting in damages totaling $450,761.61.[2] The proceeds generated by Michigan Resin were allegedly split between the Defendants, with Lemanski receiving one half of the profits, and Turner and Wells sharing in the remainder.

From an evidentiary perspective, the Plaintiff relies heavily upon the testimony of Turner in support of its underlying theory in this matter. Interestingly, however, although Turner's deposition testimony provides a plethora of evidence which clearly suggests that the Defendants engaged in wrongful conduct, her representations have evolved–often inconsistently–over time. For example, Turner, in response to the Plaintiff's requests for admissions, denied that Lemanski had ever received any form of compensation from her or Michigan Resin. (Lemanski Resp., Turner Req. to Admit, Ex. Y, ECF No. 176). Likewise, in a recorded statement taken by the Plaintiff's counsel, Turner reaffirmed this position and further denied that Lemanski had any prior knowledge of the price paid by Michigan Resin for the product which was subsequently resold to Barrette Outdoors. (*Id.* Turner Stmt., Ex. Z, 57).

---

[2] This damages calculation includes (1) the inflated price of the resin that was resold to the Plaintiff, and (2) $38,358 in commissions that RDI paid to Michigan Resin in connection with the allegedly fraudulent transactions.

3

Turner's deposition testimony, on the other hand, portrays a sharply different account of the principals' roles in this alleged scheme. She testified that Lemanski had received at least $150,000 in cash in connection with his role in the Michigan Resin transactions, and, further, that he specifically instructed her not to send RDI's invoices to the Plaintiff because use they would reflect a lower sales price. (Turner Dep. 159, 467, May 14, 2013, Ex. F, ECF No. 149). Turner also provided explicit details about the inner workings of this claimed fraudulent scheme, including, *inter alia*, that Lemanski (1) had allegedly improperly utilized her email account to transact business on Michigan Resin's behalf, and (2) threatened to remove RDI from Barrette Outdoors' supply base if they attempted to sell directly to the company. (*Id.* at 357-61; 225-27).

Lemanski, for his part, vehemently denies having any financial interest in Michigan Resin, and contends that all pricing adjustments were a direct result of either (1) a supplier incorrectly stating a price, or (2) a change in the market by the time the product was invoiced. (Lemanski Aff., ¶315-317, 332-333, Ex. A, ECF No. 176). In either case, Lemanski maintains that this practice was common place in the resin community and that Gaudreault ultimately approved of any adjustments that were issued. (*Id.* at 55, 316). In addition, Lemanski claims that he specifically inquired whether doing business with Michigan Resin was problematic, and that Gaudreault informed him it was not. (*Id.* at 38-45). Although Lemanski admits that he provided Wells and Turner with some level of industry knowledge, such as supplier contacts and distributing partners, he denies being involved in any of the transactions between Michigan Resin and RDI. (*Id.* at 26-35). Finally, addressing Turner's deposition testimony, Lemanski maintains that her story changed only after she was (1) "[driven] . . . over the edge with concern about her financial situation" and (2) offered immunity by the Plaintiff. (*Id.* at 277-78).

4

The bulk of Wells' representations corroborates Lemanski's version of the events. Indeed, Wells maintains that she and Turner owned and operated Michigan Resin with all profits to be divided between them. (Wells Aff., ¶6-9 Ex. 1, ECF No. 175). Furthermore, Wells, who was purportedly responsible for generating Michigan Resin's purchase orders and invoices, contends that Lemanski "never sent us an invoice that contained anything other than the [sale] price that [Michigan Resin] sold the material to [the Plaintiff] for." (*Id.* 37). In fact, "on several occasions [Turner] told [Wells] that she was mad at [Lemanski] because she was trying to negotiate a higher price and [he] would not budge." (*Id.* at 39). She likewise denies ever informing Lemanski of the price that Michigan Resin paid to RDI, and generally disclaims any suggestion that Lemanski was actively participating in the company's operations. (*Id.* at 2-8, 94).

## II.

The purpose of the summary judgment rule, as reflected by Federal Rule of Civil Procedure 56, "is to isolate and dispose of factually unsupportable claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The entry of a summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of summary judgment if proof of that fact would have the effect of establishing or refuting an essential element of the cause of action or a defense advanced by the parties." *Aqua Grp., LLC v. Fed. Ins. Co.*, 620 F. Supp. 2d 816, 819 (E.D. Mich. 2009) (citing *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). In order for a dispute to be genuine, it must contain evidence upon which a trier of the facts could find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 560 (6th Cir. 2004). When assessing

5

a request for the entry of a summary judgment, a court "must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party." *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). The entry of a summary judgment is appropriate only if the nonmoving party fails to present evidence which is "sufficient to establish the existence of an element essential to its case, and on which it will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

Thus, the moving party has the initial obligation of identifying those portions of the record that demonstrate the absence of any genuine issue of a material fact. *Celotex*, 477 U.S. at 323. Thereafter, the nonmoving party must "come forward with some probative evidence to support its claim and make it necessary to resolve the differences at trial." *Boyd v. Ford Motor Co.*, 948 F.2d 283, 285 (6th Cir. 1991); *see also Anderson*, 477 U.S. at 256. The presence or the absence of a genuinely disputed material fact must be established by (1) a specific reference to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or (2) a "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

With the exception of counts eight and nine of the complaint, the Plaintiff's claims are based entirely on state law. Therefore, the Court must apply the law of the forum state's highest court. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938). On the other hand, if the state's highest court has not resolved an issue, the Court may look to the "state's intermediate appellate court decisions, as well as the state supreme court's relevant dicta, restatements of the law, law review commentaries, and

6

the majority rule among other states." *Ososki v. St. Paul Surplus Lines*, 156 F.Supp.2d 669, 674 (E.D.Mich.2001).

III.

In its complaint, the Plaintiff argues that the undisputed facts show that it is entitled to a judgment as a matter of law as to nine of its claims.[3] The first three counts of the complaint (namely, fraudulent misrepresentation, silent fraud, and fraudulent inducement) require the Plaintiff to demonstrate that Lemanski made or suppressed a material representation with an intent to defraud. *Roberts v. Saffell,* 280 Mich. App. 397, 403; 760 N.W. 2d 715 (Mich. Ct. App. 2008) ("To prove a claim of fraudulent misrepresentation, or common-law fraud, a plaintiff must establish that (1) the defendant made a material representation; (2) the representation was false . . . ."); *Id.* at 404 (silent fraud arises "from the suppression of the truth . . . ."); *See Custom Data Solutions, Inc. v. Preferred Capital, Inc.*, 274 Mich. App. 239, 243, 733 N.W.2d 102 (Mich. Ct. App. 2006) ("[t]o establish a fraud in the inducement, a party must show that (1) the defendant made a material representation; (2) the representation was false.").

With respect to the material representations at issue here, the Plaintiff maintains that Lemanski knew that (1) Michigan Resin's prices were inflated, and (2) the Plaintiff could have purchased the same product directly from RDI for less. In support of this proposition, the Plaintiff relies heavily upon the statements of Turner and Jamie Marwitz, Barrette Outdoors' vice president of information technology. Turner testified, in effect, that Lemanski had used her email address to

---

[3] Count five of the complaint, "tortious inducement of breach of fiduciary duty," has been voluntarily dismissed by the Plaintiff. (Pltf's Brf., 5 ECF No. 11). Furthermore, the Plaintiff does not seek the entry of a summary judgment in connection with count eleven, "piercing the corporate veil".

negotiate with Brett Masotta (RDI's national sales manager) on Michigan Resin's behalf. (Turner Dep. 133, 139-140, Ex. F, ECF No. 149). On one particular occasion, Turner alleges that Lemanski (through Michigan Resin) reached a deal with Masotta for a load of resin at $0.63 per pound. (*Id.* at 148). Lemanski then allegedly used the Plaintiff's computer system to create a purchase order that would reflect the agreed upon terms. (*Id.*). At some point after the purchase order had been faxed to RDI, Marwitz maintains that Lemanski reentered the Plaintiff's system and changed the purchase order to reflect $0.65 per pound. (Marwitz Dep. 42-55, 55-74, Ex. K, ECF No. 153-1). Finally, on February 18, 2010, Lemanski transmitted an email to the Plaintiff's accounting department containing Michigan Resin invoice 2500. According to Turner, invoice 2500 charged Barrette Outdoors $0.65 for the same resin that Lemanski knew RDI sold to Michigan Resin for $0.63. (Turner Dep., 153-56, 367-72).

In response, Lemanski rejects this argument, contending that he "did not have access to. . . Turner's email account" and, as such, he did not have any knowledge of the price that Michigan Resin had paid to RDI prior to the product being resold to the Plaintiff. (Lemanski Aff., ¶ 337-340; Lemanski Dep., 718, Ex. A, ECF No. 148-1). Furthermore, he firmly asserts that if and when a purchase order is modified, "it would automatically be routed to an approval queue in the [g]eneral [m]anagers SAP inbox." (Lemanski Aff., 87). Thus, Lemanski submits that if the price on a particular purchase order is increased–which could be done for any number of reasons, including, *inter alia*, administrative error, compensation for logistics, changes in the market, etc.–it would have to go through a manager prior to being approved. (*Id.* at 315-18). Finally, Lemanski contends that Turner's testimony is inherently unreliable in light of the inconsistent positions taken by her throughout this litigation.

Whether Lemanski made a material misrepresentation with the intent to defraud the Plaintiff is clearly a disputed fact. The gravamen of Lemanski's position, which appears to be supported by the record, is that, notwithstanding the Plaintiff's plethora of circumstantial evidence to the contrary, there exists a plausible explanation as to why some purchase orders were modified after the fact. In addition, Lemanski maintains that the Plaintiff's system of accountability contained an administrative safeguard; namely, anytime a price was altered, it required approval by a manager. As the Sixth Circuit has made clear, "[t]hough the cold record may reflect that [the Plaintiff ] has more witnesses and documents than does [the Defendant], it is not the province of the district court to weigh the evidence or assess credibility when ruling on a motion for summary judgment." *Naumer v. Equity Residential Properties Mgmt. Ltd. P'ship*, 156 F.3d 1231, *3 (6th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Indeed, "[e]ndeavoring to accord conflicting evidence in favor of a party that has moved for summary judgment is error." *Peecook v. Nw. Nat. Ins. Grp.,* 156 F.3d 1231, *9 (6th Cir. 1998); *See also In re Atlas Concrete Pipe, Inc.,* 668 F.2d 905, 909 (6th Cir.1982) ("Where the district court must assess the relative credibility of witnesses, the case is particularly inappropriate for summary judgment . . . ."). Accordingly, the Court denies the Plaintiff's motion for the entry of a summary judgment as it pertains to counts one through three of the complaint.

The majority of the Plaintiff's remaining claims all depend on the same alleged misrepresentation discussed above. In count four, for example, the Plaintiff maintains that Lemanski breached his fiduciary duty to the company "because he knowingly diverted the opportunity to purchase resin from RDI and instead purchased that same resin from [Michigan Resin] at inflated prices." (Plf's Brf. 23, ECF No. 148). Count six avers that Wells aided in Lemanski's breach of his

9

fiduciary duties by, *inter alia,* "using [Michigan Resin] to usurp [the Plaintiff's] opportunity to purchase resin directly from RDI." (Plf's Brf. 9, ECF No. 155).  In response, Lemanski maintains that, in his judgment, Michigan Resin frequently offered the best overall terms/price when compared to its competitors and, moreover, that he was never given advance notice of RDI's pricing.

"A fiduciary relationship arises from the reposing of faith, confidence, trust, and the reliance of one upon the judgment and advice of another." *Ulrich v. Federal Land Bank of St. Paul*, 192 Mich. App. 194, 196; 480 N.W.2d 910 (Mich. Ct. App. 1991). Relief is granted if and when such a position of influence has been acquired and abused, or when the confidence has been reposed and betrayed. *Id*. Likewise, aiding and abetting the breach of a fiduciary duty requires, at a minimum, that the defendant "have the same degree of scienter as the person committing the actual fraud." *Chase Bank v. Grant Thornton,* 2003 WL 21350362, *4 (Mich. Ct. App. 2003) (unpublished). In order to prevail on these claims, Barrette Outdoors must prove that (1) Lemanski breached his fiduciary duty and (2) Wells had knowledge of the breach.

The material facts surrounding Lemanski's alleged breach of fiduciary duty are plainly in dispute. As mentioned, Lemanski denies having any advance knowledge of Michigan Resin's procurement costs or its pricing strategy. Moreover, he argues that selecting the vendor with the lowest price wasn't always the most important consideration. (Lemanski Aff. ¶2). According to Lemanski, Barrette Outdoors' management instructed him to maintain relationships with multiple suppliers to ensure they had "access to materials in the event one producer had a manufacturing facility go down." (*Id.* at 8-12). Although it is true that a trial court has some discretion to gauge the plausibility of evidence, where, as here, the non-moving party offers a number of alternative theories supported by the record, the normal rule preventing summary judgment will apply. *Betkerur v.*

10

*Aultman Hosp. Ass'n,* 78 F.3d 1079, 1087-88 (6th Cir.1996); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479-80, 1482 (6th Cir.1989). Accordingly, the Court denies Barrette Outdoor's motion with respect to counts four and six.

The Plaintiff's next set of claims, counts eight, nine, and ten, allege the existence of a civil conspiracy and violations of various provisions of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. 1961, *et seq.* The crux of the Plaintiff's argument here is that "Lemanski, Turner, and Wells associated in an ongoing enterprise designed to perpetrate the fraudulent pass-through scheme against Barrette whereby they abused Lemanski's position as Barrette's [p]urchasing [m]anager in order to sell resin to Barrette at inflated prices." (Plf's Brf. 31, ECF No. 148). This is the same general theory that has been previously discussed by the Court.

The Plaintiff's RICO and civil conspiracy claims all share the same element that is ultimately fatal to their success at this juncture; namely, the existence of an enterprise consisting of two or more individuals formed for the purpose of accomplishing some unlawful means. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985) (In order to establish a RICO claim, a plaintiff must establish that the defendant engaged in "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."; *See also Temoborius v. Slatkin*, 157 Mich. App. 587, 599-600; 403 N.W.2d 821 (Mich. Ct. App. 1986) (A civil conspiracy is "a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means.").

As discussed, the degree of Lemanski's involvement with Michigan Resin is a hotly contested issue. While it is true that this Court imposed an adverse inference against Lemanski stemming from his conduct during discovery, the implication is simply that his cell phone and

11

personal laptop contained unfavorable information which suggested that he was *involved* with Michigan Resin. Thus, it should be pointed out that the nature of his role and the underlying purpose of the organization are still live issues.[4] Moreover, even assuming, *arguendo,* that Lemanski was involved in the day-to-day operations of Michigan Resin, there is undeniably a question of a material fact relating to what extent, if any, he financially benefitted from his participation in this commercial endeavor. Indeed, while the Plaintiff offers the affidavits of numerous contractors in support of the proposition that Lemanski used the cash proceeds received from Michigan Resin to fund the construction of his home, he offers a plausible explanation in response; namely, that the building funds originated from a substantial insurance settlement received by him after his home was damaged by fire. (Lemanski Aff.  ¶285). As mentioned, "it is an error for the district court to resolve credibility issues against the nonmovant: In effect, any direct evidence offered . . . in response to a summary judgment motion must be accepted as true." *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008). Accordingly, the Court must and does deny the Plaintiff's request as it pertains to counts eight, nine, and ten.

Finally, the Plaintiff argues that it is entitled to a summary judgment in connection with count seven, tortious interference with prospective business relations. As mentioned, the Plaintiff claims that Lemanski created Michigan Resin in order to purchase product from RDI and then resell it to Barrette Outdoors at inflated prices. As a result, the Plaintiff argues that Lemanski interfered with its previous relationship with RDI by diverting its sales to Michigan Resin.

In order to prevail on its claim for tortious interference with a business relationship, the

---

[4] Lemanski's role in Michigan Resin is critical to Barrette's RICO and conspiracy claims against all of the Defendants.

Plaintiff must establish "[1] the existence of a valid business relation . . . or expectancy; [2] knowledge of the relationship or expectancy on the part of the interferer; [3] an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and [4] resultant damage to the party whose relationship or expectancy has been disrupted." *Woody v. Tamer*, 158 Mich. App. 764, 776; 405 N.W.2d 213 (Mich. Ct. App. 1987) (*quoting Northern Plumbing & Heating, Inc. v. Henderson Bros., Inc.,* 83 Mich.App. 84, 93, 268 N.W.2d 296 (1978)). Here, there is little doubt that Lemanski, as Barrette Outdoors' senior purchasing manager, had knowledge of his company's relationship with RDI. Even assuming this belief to be true, however, Michigan law requires a plaintiff to establish a malicious motive on the part of the interferer. *Feldman v. Green,* 138 Mich. App. 360, 369-70, 371 n. 1, 360 N.W.2d 881 (Mich. 1984) (noting that "if 'the persuasion be used for the indirect purpose of injuring the plaintiff, or of benefiting [sic] the defendant at the expense of the plaintiff, it is a malicious act . . . . '"). For the reasons previously identified, the Court finds that there exists a question of material fact with respect to Lemanski's motive in diverting the Plaintiff's business to Michigan Resin. Accordingly, the Court likewise denies the Plaintiff motion with respect to this claim.

IV.

For the reasons outlined above, the Plaintiff's motions for summary judgment against Lemanski (ECF No. 148) and Wells (ECF No. 155) are denied.

IT IS SO ORDERED.

Date: August 8, 2014                    s/Julian Abele Cook, Jr.
                                        JULIAN ABELE COOK, JR.
                                        U.S. District Judge

13

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on August 8, 2014.

s/ Kay Doaks
Case Manager
